DICKEY *against* THE UNITED INSURANCE COMPANY.

Insurance on vessel and cargo, " at and from *St. Bartholomews* to *Havanna*." The insurers were informed, that the vessel would have some negroes on board, bound to the *Havanna*, the cargo consisted of soap, wine, &c., and the policy contained a *warranty*, " free from loss, if not permitted to entry, in consequence of having negroes on board."

The vessel arrived on the 23d of *October*, in the evening, at the *Havanna*, and came to anchor off the *Moro Castle*, the place where all vessels must stop to be visited, and where vessels having negroes on board, must, after being examined, land their negroes, before they are permitted to come up to the dock, in the inner harbour, which is the usual place for landing cargoes, other than negroes, and about three quarters of a mile from the *Castle*, where the vessel anchored.   The consignee had presented the papers, and a petition, to the custom-house officer, in the usual form ; but during all the 24th of *October*, there was so violent a storm, as prevented all communication with the vessel; and on the next day the storm increased to a hurricane, and the vessel, though moored with three anchors, was run foul of by another, and driven ashore, and wholly lost, with her cargo.

It *was held*, that the vessel, at the time of the loss, had not been " moored twenty-four hours in good safety," in her destined port, and was still covered by the policy ; that the meaning of the *warranty* was to guard against the consequence of not being permitted to an entry *at the custom house only*, and which, not having been refused, the event provided against by the *warranty* had not occurred, and the insured were entitled to recover for a total loss.

THIS was an action on two policies of insurance, one on the schooner *Minerva*, and the other on the *cargo* on board of the same vessel, at and from *St. Bartholomews* to *Havanna*."   In the order for the insurance, the defendants were informed, that the cargo consisted of *soap, wine,* &c. and that the schooner would have on board some negroes, bound to the *Havanna*.   The policy contained a written *warranty*, " free from loss, if not permitted to entry, in consequence of having negroes on board."

The cause was tried at the *New-York* sittings, in *November*, ALBANY,
1813, before the late Chief Justice, when a verdict was taken August, 1814.
for the plaintiff for 7,000 dollars, subject to the opinion of the    DICKEY
court on a case made, the amount of the verdict to be re-    v.
duced as the court might direct.    UN. INS. CO.

The *Minerva* sailed from *St. Bartholomews* on the voyage
insured, the 10th of *October*, 1810, having on board forty-five
*African* negroes, beside a cargo of soap, wine, &c. From
the 19th to the 23d she experienced violent winds, and on the
evening of that day anchored near the *Moro Castle*, at the en-
trance of the port of *Havanna*, which was the usual place for
vessels, having negroes on board, to come to. Vessels
loaded in whole or part with slaves, are not permitted, by the
laws of *Havanna*, to come to the usual places for landing other
cargoes, until they have been visited, and the slaves are
landed. On the 24th of *October*, the usual petition was pre-
sented by the consignees, in behalf of the *Minerva*, to the pro-
per officers, praying that she might be visited and examined,
according to the direction of the law, previous to landing the
slaves. The weather, on the 24th *October*, was exceedingly
tempestuous, and the *Minerva* was secured, as well as possible,
with three anchors. On the 25th of *October*, a violent hurri-
cane prevailed, which prevented all communication with the
shore, and rendered it impossible to remove her to a place of
safety. During the gale, she was run against by another vessel,
and was driven ashore among the rocks, and was wrecked, with
many other vessels. The vessel and cargo were sunk, and
wholly lost, except the slaves, who escaped, with the crew,
one of the negroes only being lost.

From the time of her arrival, until she was lost, it was im-
possible to complete the examination and entry of the *Miner-
va*, and have her moved to a place of safety, agreeably to the
laws and regulations of the port. The place where the *Mi-
nerva* anchored, though the usual place for landing negroes,
and convenient for that purpose, was not a safe or usual place
for landing cargoes of goods. The *Minerva* was lost within
the harbour of *Havanna*, that is, within the *Moro Castle*. All
vessels are obliged to come to, on arriving opposite the *Moro
Castle*, until visited by the health and custom-house officers;
but vessels are not considered as in safety, until moored at the

dock, at the city, which is three-fourths of a mile from the *Castle*, and where cargoes, except negroes, are usually landed.

*Wells*, for the plaintiff. The *Minerva*, though she arrived at *Havanna*, was not moored " twenty-four hours in good safety," before the storm arose which occasioned her loss. She was, therefore, protected by the policy at the time of the accident. She must not only be anchored or moored, but she must be in a situation to enable her to discharge her cargo.

Where a vessel arrives at her destined port, and is immediately ordered to quarantine, during which she cannot deliver her cargo, she is considered as covered by the policy.*

The laws and regulations of the port of *Havanna* required all vessels to come to anchor off the *Moro Castle*, precisely where the *Minerva* anchored, in order that they may be visited before landing their cargoes. She could not, without a breach of those laws, have gone up to the city or wharf.

In *Parmeter* v. *Cousins*,† tried before Lord *Ellenborough*, the ship met with tempestuous weather on her outward voyage, and when she arrived at *St. Michaels* she was so leaky as to be unable to take in a cargo, and there being no harbour in the island, she was in danger from the storm, which continued, and after being at anchor twenty-four hours, was driven to sea and lost. The insurance being *at* and *from St. Michaels*, it was held, that the policy on the *homeward* voyage did not attach, as she had not been *at St. Michaels* in good safety. She must, therefore, have been considered as still covered by the policy on the outward voyage *to St. Michaels*. The principle of that case is applicable to the present.

In regard to the policy on the *cargo*, it will be said, that the *Minerva* having stopped short of the place at which cargoes are usually landed at *Havanna*, there was a *deviation*. But the insurer knew that negroes were on board, and stopping to land them at the usual place does not amount to a deviation, it being according to the usage of trade, which insurers are bound to know.‡

Again, it will be said, that the loss arose in consequence of having the negroes on board, but the defendants underwrote the policy with full knowledge of the fact, and calculated the premium accordingly. All the consequences, therefore, which might follow from that fact, were risks within the policy.

* *Waples* v. *Eames*, 2 Str. 1243. *Minet* v. *Anderson*, *Peake*, 211. *Park*, 45.

† 2 *Campbell* N. P. Rep. 235.

‡ *Doug.* 492.

2. Are the defendants protected by the special warranty, of "free from loss if not permitted to entry, in consequence of having negroes on board?" The plain and obvious meaning of this clause is, that if by a total prohibition of entry on that account, any loss should occur, the defendants were not to be answerable. It has no reference to a temporary suspension of the entry, until the vessel had conformed to the rules and regulations of the port. She was not refused an entry; on the contrary, she would have been permitted to enter had not she been lost by the storm which arose immediately on her arrival.

*D. B. Ogden* and *Hoffman*, contra. The vessel was not lost, in fact, until forty-eight hours after her arrival. The evidence in the case shows that the *Minerva* came to anchor off the *Moro Castle*, for the sole purpose of having the negroes examined and landed; and that for every other purpose, she might have gone up to the wharf, or usual place of landing the cargo, the necessary papers having been presented to the proper officer by the consignee for that purpose. The loss must, therefore, be regarded as the direct consequence of her having negroes on board. This is a peril against which the defendants did not insure.

No perils of the sea are within a policy, after the vessel has been moored twenty-four hours in safety, unless she is under arrest or detention immediately on her arrival. Suppose a vessel arrives at *New-York*, and after being moored twenty-four hours, some difficulty arises with the custom-house officer, and she is not allowed to enter, and a storm arises in which she is lost, can it be supposed that the underwriter would be liable? In the case of *Waples* v. *Eames*, the vessel was ordered back to quarantine, before she had been moored twenty-four hours.

In *Angestein* v. *Bell*,* tried before Lord *Kenyon*, the vessel arrived at the wharf where she intended to unload, but was placed outside of a tier of vessels, where, after remaining anchored in that situation, for several days, she was forced adrift by the ice and lost; and it was held that she had been moored twenty-four hours in good safety, before the accident happened, and the plaintiff was nonsuited.

As soon as a vessel casts anchor in her destined port, the twenty-four hours commences, though she may be delayed, by

*Park, 45, 48.*

ALBANY,
August, 1814.

DICKEY
v.
UN. INS. Co.

difficulties, at the custom-house, from entering and discharging her cargo.

If a vessel is insured for six months, and she survives that time, though she received her death wound before, the underwriters are not liable. Suppose the vessel has been twenty-three hours in good safety, before she is admitted to an entry, will she be covered by the policy for twenty-four hours longer?

The question in the case of *Parmeter* v. *Cousins*, was between the outward and homeward policies, or when the homeward policy attached.

Again, as to the policy on the cargo; the insured were bound to proceed with all due diligence, not only to the port of destination, but to the usual and safe place for landing the cargo; and had she not been detained, in consequence of having negroes on board, she might have gone up to the city, a place of perfect safety, in which case the loss would not have happened.

Again, as to the warranty; the clause, like every other, must be construed according to the intent of the parties. Now, all the facts, in the case, plainly show, that it was the intention of the warranty to protect the insurers from any loss arising from the fact of having negroes on board. The warranty had no reference to an entry at the custom-house, but only to a right of going into the port of *Havanna*, without regard to the custom-house.

*T. A. Emmet*, in reply. The word " entry" has a positive and established meaning among merchants, and is always used in reference to the custom-house. The clause was, most probably, introduced, in consequence of what was said by Mr. Justice *Livingston*, in the case of *Suydam & Wyckoff* v. *The Marine Insurance Company*,* who, though he thought, after much reflection, and many doubts, that a denial of entry at the port of destination was not a risk within the policy, yet the point was not expressly decided, in that case, nor has it been put at rest by any subsequent decision. This warranty was intended to prevent all questions, on a doubtful point, by an express stipulation on the subject. Now there was no denial of an entry at the custom-house in the case.

* 1 *Johns. Rep.* 181—190.

The accident might have happened in any part of the port of *Havanna,* for the *Minerva* was run foul of by another vessel, in a most violent hurricane, and driven from her moorings ; and many other ships were lost at the same time.

PLATT, J. delivered the opinion of the court. It appears that the port of *Havanna* consists of an *outer harbour* or qua-rantine ground, near the *Moro Castle,* used for the purpose of visit and search, and for the landing of slaves, which is an ex-posed and dangerous station; and of an *inner harbour* at the city, where vessels having cargoes, other than slaves, usually anchor and discharge, after having been visited at the castle ; and which *inner harbour* is a place of safety.

In this case, the vessel arrived at the outer harbour, moored at the usual place for being visited, and for landing that part of her cargo which consisted of slaves, and without any unreason-able delay, in that dangerous situation, was wrecked by storm, before she could have proceeded to the place of safety, in the inner harbour, without violating the laws of the port.

As it regards the vessel and that part of the cargo insured by these policies, I am of opinion that the voyage insured was to end at the *inner harbour ;* and, of course, that the *Minerva* was not "*moored twenty-four hours in good safety*" at that port, or the usual place for unloading cargoes. (2 *Str.* 1244.)

The peculiar hazard and exposure of the outer harbour, during the necessary detention there, must be considered one of the principal perils insured against ; for in no part of the voy-age, probably, was the vessel exposed to equal danger.

The underwriters were expressly informed by the assured, before they signed the policy, that the schooner would have on board some negroes bound for the *Havanna.* They must be presumed to know the usages of the destined port, and every other fact material in calculating such a risk.

It is very questionable, from the evidence in the case, whe-ther any delay was occasioned by the having negroes on board, for the violence of the storm was so great from her first arrival until her loss, that the necessary visitation, required by the regu-lations of the port, could not be made ; and the risk could not be said to be ended, as long as the delay was occasioned by one of the perils insured against.

The defendants seek protection under the special clause in the policy, viz. " warranted free of loss if not permitted to entry in consequence of having negroes on board;" and the only remaining question is, whether the vessel failed to complete her voyage in safety, *by reason of* " not being permitted to entry in consequence of having negroes on board ?"

I think the cause of loss intended to be guarded against, and excepted by these policies, *did not occur* in this case. The terms " *not permitted to entry,*" mean custom-house entry. The parties had in view the possibility that the entry of vessels with negroes on board might be interdicted by the laws of that port; not that the *Minerva* should be exempt from a compliance with the customary port regulations, as to the *mode* and *place* of discharging such a cargo.

There was no such interdiction in this case. By the laws of *Havanna*, vessels having negroes on board were "permitted to entry;" and while going through the forms necessary and usual for that purpose, the vessel and cargo insured were destroyed by the tempest, before they arrived at the end of their voyage. The plaintiff is entitled to recover.

Judgment for the plaintiff.(*a*)

(*a*) See *Hornyer* v. *Lushington*, (15 *East*, 46,) and *Bell* v. *Bell*, (2 *Camp. N. P. Rep.* 475.)