LORING MEIGS *vs.* THE MUTUAL MARINE INSURANCE COMPANY. JOSEPH R. TABER *vs.* THE SAME.

A vessel was insured for a whaling voyage, the risk to continue on and during her voyage and back to M., "until she be arrived and moored at anchor twenty-four hours in safety ; " on her return from the voyage, after coming within the harbor of M., being unable, for want of a sufficient depth of water, to reach the wharf to which she was destined as the place of unlading, with all her cargo in, she anchored at some distance (being the usual place) from the wharf, for the purpose of lightening, in order to enable her to reach it ; and, while lightening and making her way to the wharf, with proper diligence, she was destroyed by fire ; it was held, that the vessel had not arrived within the terms of the policy, and that the underwriters were responsible for the loss.

A usage, which shows when a voyage is terminated, so far as relates to the payment of premium notes, is not applicable to show when a voyage terminates, with reference to the payment of losses.

THESE were actions of assumpsit on policies of insurance, subscribed by the defendants, on the ship Joseph Meigs and catchings on a whaling voyage. The writs were dated February 16th, 1847.

In the first entitled case, the policy was dated March 23d, 1846, and was for " $5000, on the ship Joseph Meigs, and $3000, on catchings on board said ship, valued as in the margin, commencing the risk on the 14th day of October, 1845, at noon, to continue on and during her whaling voyage, in all and any oceans and bays, and back to Mattapoisett, with liberty to touch at all ports or places for refreshments, and to sell her catchings or ship them home ; beginning the adventure upon the said ship and catchings, as aforesaid, and to continue during the voyage aforesaid, on the vessel, until

she be arrived and moored at anchor twenty-four hours in safety, and on the property until landed."

The valuations in the margin were : ship, $20,000; sperm oil, 90 cents a gallon ; whale oil, 36 cents; whale bone, 35 cents a pound. Premium, 1⅝ per cent on ship, and 1½ per cent on catchings, if the risk ends within six months, and *pro rata* for a longer time.

In the second case, the policy was dated September 19th, 1844, and was for $4000, on the ship Joseph Meigs and whaling outfits, on each interest in proportion, as valued in the margin, at and from Mattapoisett, on and during her whaling voyage, in all and any oceans and bays, and back to Mattapoisett, with liberty to touch at all ports or places for refreshments, and to sell her catchings or ship them home ; " beginning the adventure upon the said ship and outfits, at the date hereof, at noon, as aforesaid, and to continue during the voyage aforesaid, on the vessel, until she be arrived and moored at anchor twenty-four hours in safety, and on the property until landed."

The valuations in the margin were : vessel, $20,000, not including premium ; outfits, $12,000. Premium, 1½ per cent, if risk ends within two years, and *pro rata* for a longer time.

The declarations, in both cases, alleged, that while the vessel was proceeding upon her voyage, and having on board catchings of great value, namely, $20,000, and before the same were landed, she was burned and wholly destroyed by fire, whereby the vessel and catchings on board became wholly lost, &c.

These actions were withdrawn from the jury, and submitted to the court upon two questions, namely; first, whether the ship, at the time of her destruction, had "arrived," within the meaning of the policy, which question was to be decided by the testimony of Stephen Nye ; and, secondly, whether, according to a certain usage, testified to by Ferdinand Vassault, and other witnesses swearing to the same facts, if the same was admissible in evidence, the risk had terminated at the time of the loss.

Stephen Nye testified as follows : That he had resided at Mattapoisett nearly fifty-nine years, for over forty of which he had followed the sea; that he had been a branch pilot of that port for more than three years, and a pilot for about four years ; that, before he held a branch, he had frequently piloted vessels in and out, and had stood his own pilot for twenty years; that he piloted the ship Joseph Meigs to sea upon her last voyage, and piloted her in, at the request of Loring Meigs, who called at his house between eleven and twelve o'clock at night ; that he got on board about daylight, in Buzzard's Bay, the vessel being then about six or eight miles south-south-west from West Island ; that he went on board as pilot, the master not being on board, and took charge of the vesse!, to bring her into the harbor of Mattapoisett.

When the witness took charge of the vessel to go to sea, he took charge of her at the Long Wharf; and, on her return, he was to bring her to the same place from which he took her at Mattapoisett. He brought her to anchor off Mattapoisett Light, within the harbor, about eight o'clock in the forenoon, on Saturday, the 20th of June, about one third or one quarter of a mile within ; and he brought her to anchor there, because there was not water enough for her to go to the wharf. He came to anchor with one anchor. The vessel drew sixteen and a half feet. At the top of the tide, he could carry twelve and a half feet to the wharf.

The witness went ashore, about nine o'clock, on Saturday, to get a change of clothing, being wet through, leaving his deputy pilot, Cowen, in charge of the vessel, and returned between ten and eleven o'clock. He then remained on board until after breakfast, on Sunday, when he again went ashore, leaving Cowen in charge, and returned between four and five o'clock in the afternoon. He went ashore again on Tuesday morning, to assist in getting a lighter off, having nothing to do aboard ship, and was absent perhaps about two hours; and again in the evening, and staid until high water, when he returned. On Wednesday, the witness went ashore with a lighter load, and was gone about two or three hours; on

Thursday, he went ashore about fifteen or twenty minutes, and returned immediately; on Friday, he remained on board the whole day; and on Saturday, the 27th of June, he left the vessel between one and two o'clock in the afternoon.

On Saturday, the 27th of June, when the witness first brought the vessel to anchor, nothing material was done. He could not say, whether any lighter was then in port; but thought there was a small packet, which sailed the next day for New York. On the following Monday, they sent down the royal yards and masts, and topgallant-masts and yards, and unbent all the sails, except the three topsails, spanker and jib. These were left to work the ship up to the wharf with, and were entirely sufficient for that purpose. They sent down the spars, and unbent the sails, according to the general custom, for the safety of the vessel, and to clear her of all the trumpery they could; and the spars, sails, and loose things were sent ashore in the evening. On that day, they were not able to send any oil on shore. The lighter was a coasting vessel, running to New York and Connecticut. She had some cargo in when she came off. The witness did not recollect seeing her there on Saturday. On Tuesday, the lighter got out her cargo, and came off and took out two loads of oil that day, but could not take any more. On Wednesday, she took two loads, and could not take more. On Thursday, they took one load, and then moved the ship between two and three hundred yards nearer the wharf, but could not move her farther, on account of the wind, and could not take out more than one load, because, while the ship was under weigh, they could not have the lighter alongside. The vessel was got under weigh at about eleven o'clock in the forenoon, and brought to anchor between four and five in the afternoon, the wind being then ahead, light and baffling. On Friday, one lighter load was taken out of the vessel; the boats were sent ashore, and the vessel was got under weigh and moved between two and three hundred yards. The vessel could not be moved farther, by reason of light and baffling winds, and could not be got under weigh until nearly

nigh water ; nor could more oil be got out on Thursday and Friday than was done, and move the ship. On Saturday, they took out one lighter load, hove in short to get under weigh, and loosed the sails ; but could not get under weigh, owing to the wind's hauling to the north, and squally weather and fresh wind. The lighter could not get back, having gone into the dock and grounded. We reefed the sails of the lighter when she left us. Finding that she could not return, they took out twenty-eight casks of oil, and hoisted them on deck, for the purpose of going on board the lighter, or to trip the ship in going to the wharf.

There is a place, called " the bar," off the wharf, at the distance of about one hundred and fifty feet, where the water is shoaler, from three to five inches, and the bottom is not the same, but hard and gravelly. The oil was got on deck with reference to getting the vessel over the bar, for the purpose of tripping her, or putting it right into a lighter and getting her ahead.

The witness could not tell what portion of the cargo was landed, but should think eight or nine hundred or a thousand barrels. He had nothing to do with landing the cargo, any more than he had a mind to, but did give some aid in that work. His duty was to act as pilot and attend to the ship. The cook and some of the crew remained on board, and there was cooking on board every day. The average number of the crew on board was about seven, and nineteen besides the witness were engaged in lightening the ship. The third officer, Johnson, was one of them. He went on shore with the witness, on Saturday, the 27th of June.

When the witness went ashore, no other officer was aboard but the third officer. The witness left the ship between one and two o'clock. It was high water between ten and eleven that night, as near as he could calculate. His intention was to return in the evening, if there was a prospect of getting the ship to the wharf, and attend on her at high water. The wind was unfavorable at high water, being north-west and blowing right from the wharf. The third officer told the

witness, that he was going on shore to get his dinner, and should then return to the ship; and the witness said to him, that if there was any chance at high water, he wanted to get the ship to the wharf, and wanted him to be there. When the witness found that there was no chance of getting the ship in to the wharf, he returned to his house again, and the next he knew the ship was on fire. His house was in view. The vessel burned to the water's edge, and then sunk.

Upon cross examination, the witness testified: That he weighed anchor, after getting on board, as soon as he could take the ship and get under weigh; anchored at eight o'clock in the forenoon with the best bower anchor, and had the other anchor ready in case of need, with a range of chain overhauled; and anchored in eighteen feet of water, at the usual place of anchoring ships of that class for lightening to go to the wharf; but that there was no ship of the same class, at that time, belonging to Mattapoisett, that he knew of.

The chief mate left the ship in the forenoon. The witness left his partner to take care of the ship, and, while the witness was gone, they left the ship. The chief mate and second mate might have taken their things. The witness could not say when the mate left. The officers left while the witness was gone to change his dress. When he returned, he found his partner, and from ten to twelve of the crew. The crew consisted of from twenty-five to thirty men. When the witness returned, the second mate was there, but he left soon after, and did not come back, that the witness recollected.

The men had not generally taken their things; but took them at different times, coming off in boats and lighters; and they came on board and took them as they wanted them. The witness did not recollect seeing the captain on board. Cowen was connected with the witness in piloting. No one came on board, on Saturday, to assist in dismantling the vessel. Cowen staid on board while witness was absent, but went ashore when he returned. The witness gave directions about dismantling the ship, and assisted in doing it. They

had a part of the crew and some hired men from the shore. The third mate came on board in the fore part of Monday, and brought a boat's crew, between eight and nine o'clock in the forenoon ; and the witness and those on board had been dismantling the vessel perhaps an hour and a half before they came.

The crew and third mate had the care of discharging the cargo. The latter had the usual care of a third mate. The witness was not able to tell how many were there who had not belonged to the ship ; but there were seven that had belonged to her that he knew of. The whole discharging of the ship was not by the orders of Johnson, the third mate. The captain of the lighter, Robbins, took the oil. There was no other officer on board. He gave directions, as well to those who did not belong to the ship as to those who did. The witness was not employed by Johnson, but was asked by him, once or twice, to lend a hand at the nipper.

The witness was paid $32 for his services, which included the compensation of Cowen, who was a deputy pilot, regularly appointed. The fee for a vessel drawing sixteen feet is $32. The usual fee for bringing the vessel into that place of anchorage, in good weather, is half pilotage. The witness's fee is $2 a foot from outside of the bay to the wharf at Mattapoisett. Only one lighter was employed.

The witness had carried this ship in on her previous voyage, and anchored her at the same place. He could not tell the exact time it took to get out a load. They worked diligently all day, and had stormy weather pretty much of the week. He did not recollect exactly, but thought that she was seven or eight days before getting to the wharf on the previous voyage. The bar is south-south-east from the head of the wharf, and the wharf bore from us north-north-west distant about one mile.

The other witness, upon whose evidence these causes were submitted, Ferdinand Vassault, testified as follows : —

That he was the assistant secretary of the Bedford Commercial Insurance Company, and had been so for three years,

and that he had with him the books of the company, denominated the termination book, journal and bill book, which reached back five or six years.

The Bedford Commercial Insurance Company issued a policy upon the ship Joseph Meigs, on the 8th of September, 1842, of the same form with that used in this case, and the witness read a copy of it from his book. The termination book is the record of the expiration of risks. The premium note is taken out when the premium has expired, and is entered on the book. Twenty-four hours after the vessel arrives in New Bedford, above Palmer's Island, and is there at anchor, the premium note is taken out and made up, and entered on this book. The notes are payable in sixty days after the termination of the risk.

The witness exhibited a note, which, he stated, was entered on the termination book as due August 24th, 1844, and paid August 24th, 1844, and which had been entered June 20th, 1844; and stated that the date for entering in that book was when the arrival was announced in a publication, in New Bedford, styled the " Whaleman's Shipping List," or the " New Bedford Mercury," which was the same ; and that the notes were not taken out, until such announcement of the arrival of the vessel. This constituted a part of the usage.

The witness stated, that this was the uniform custom in the office of the company, in whose service he was, according to his experience ; and that within the period above mentioned, there had been eight hundred or a thousand risks which had expired.

It appearing, in the course of the examination of Vassault, that the note exhibited was given for insurance upon vessel and cargo, the court inquired of the defendant's counsel, whether, if the cargo had been destroyed by fire, after the vessel had been at anchor twenty-four hours in safety, the risk on the cargo would have terminated, and was answered that it would not.

Upon cross examination, the witness testified : That vessels frequently anchored below Palmer's Island, which is in the

harbor, one part being above, and the other part below; and that he did not know of any difference in the pilotage; but he afterwards added, that he believed that Palmer's Island was not in the harbor of New Bedford, and that the custom he had testified to applied only to vessels which had anchored above Palmer's Island.

The witness further stated, that his knowledge of the arrival of the Joseph Meigs, for insurance upon which the note before mentioned was given, was derived from the newspaper, and that he acted upon that in taking out the note; and that the policy was on the ship and outfits.

The defendants introduced other witnesses to the like statements of the usage in New Bedford; and it was conceded, that it was usual, on the arrival of whaling ships at the anchorage where they unlade, or are lightened, to permit those of the crew who desire it to leave the ship, and to hire men to unlade and perform ship's duty, whose wages are charged to those who leave.

These causes were argued at a former term.

*B. R. Curtis*, for the plaintiffs.

1. Had the vessel "arrived," within the terms of the policy, according to the testimony of Nye? Long Wharf was the place to which the ship was destined; and all that was done, after the ship was anchored, was with reference to getting the ship there. The risk does not end when a ship comes within the limits of her port of destination; but only when she comes to the place of unlading; she must be in a condition to enable her to discharge her cargo. *Waples* v. *Eames*, 2 Stra. 1243; *Dickey* v. *United Ins. Co.* 11 Johns. 358; *Samuel* v. *Royal Exchange Assurance Co.* 8 B. & Cres. 119; *King* v. *Middletown Ins. Co.* 1 Conn. 184, 239, 339; *Oliverson* v. *Brightman*, 1 Car. & Kir. 360.

2. Evidence of usage is inadmissible to control the legal meaning of the policy. *Eager* v. *Atlas Ins. Co.* 14 Pick. 141; *Taunton Copper Co.* v. *Merchants Ins. Co.* 22 Pick. 108; *Perkins* v. *Franklin Bank*, 21 Pick. 483, 485; *Frith* v. *Barker*, 2 Johns. 327; 1 Duer on Ins. 245. The evidence,

if received, would directly contradict the policy as to the cargo; and is inconsistent with the object of the policy, namely, insurance during the continuance of the risk. Nor does it apply to this case, but only to premium notes. The defendants show no case of the adjustment of a loss according to the alleged usage. The usage is *diverso intuito ;* and is, besides, merely local, respecting New Bedford only, and not Mattapoisett.

*C. G. Loring,* also for the plaintiffs, as to the first point, referred to *Taber* v. *Nye,* 12 Pick. 105 ; *Pinkham* v. *Macy,* 9 Met. 174 ; and, as to the usage, to 1 Greenl. Ev. §§ 280, 295 ; *Blackett* v. *Royal Ex. Ass. Co.* 2 Cr. & Jerv. 244 ; *Hall* v. *Ocean Ins. Co.* 21 Pick. 472, 482 ; 2 Stark. Ev. 566 ; *Parkinson* v. *Collier,* Park on Ins. 470 ; 1 Phillips on Ins. 17 ; *Homer* v. *Dorr,* 10 Mass. 26 ; *Citizens Bank* v. *Nantucket Steamboat Co.* 2 Story, R. 16 ; *Yates* v. *Pym,* 6 Taunt. 446 ; *Strong* v. *Bliss,* 6 Met. 393.

*T. D. Eliot,* for the defendants.

1. Had the vessel arrived on the 20th June, 1846 ? When the ship was moored, on that day, within the harbor, the policy terminated. The captain was not on board after that day. The ship was then at the only place, where her cargo could be discharged; and it was known, when the policy was made, that the ship could not go to the wharf to be unladen.

The ship was dismantled ; the crew as such discharged ; and the voyage considered as at an end. On her return from a former voyage, the vessel was anchored at the same place, and lay there seven or eight days, before getting to the wharf, and the adjustment was made as stated by Vassault.

To what time was the ship insured ? Till she was moored at anchor, in the harbor in Mattapoisett ; not till she was at the wharf. When she was anchored where the plaintiffs elected, without any unexpected obstruction to her farther progress, the risk was terminated. The cases cited for the plaintiffs are all of them consistent with the defendants' view of the case at bar. The ships, in those cases, were not rightfully moored twenty-four hours in safety. *Minett* v. *Ander-*

*son*, Peake's Cases, 211.   In *Samuel* v. *Royal Ex. Ass. Co.*
8 B. & Cres. 119, the ice was an unexpected obstacle,
which prevented the ship from being moored at the propei
place.   As to involuntary mooring, see M'Culloch's Com.
Dict. Docks and Dock Charges.   In *King* v. *Middletown
Ins. Co.* 1 Conn. 184, the question was, what was the *port*
of discharge, and two judges dissented.   In none of the cases
cited for the plaintiffs had the ship arrived at her place of
destination, for the purpose of discharging her cargo.   See *De
Longuemere* v. *New York Firemen Ins. Co.* 10 Johns. 120,
126 ; 1 Phillips on Ins. 442 – 445, (2d ed.) 456, 470, 473, and
cases there cited ; *Union Insurance Co.* v. *Tysen*, 3 Hill.
118, 126 ; *Seamans* v. *Loring*, 1 Mason, 127, 140 ; *Glennie*
v. *London Assurance Co.* 2 M. & S. 371, lord Ellenborough's
opinion ; *Angerstein* v. *Bell*, Park on Ins. 55 ; *Lockyer* v.
*Offley*, 1 T. R. 252, 261 ; *Bill* v. *Mason*, 6 Mass. 313 ; 3
Kent, 307 ; Park on Ins. 64 ; *Leigh* v. *Mather*, 2 Esp. R.
412 ; *Camden* v. *Cowley*, 1 W. Bl. 417.

2. The evidence, as to the usage, was not introduced to
control or vary the terms of the policy, but to show what was
meant by those terms.

*T. G. Coffin*, also for the defendants, as to the question,
whether, on Nye's testimony, connected with the usage, the
ship had arrived and been moored twenty-four hours in safety,
referred to *Bradford* v. *Drew*, 5 Met. 188 ; 1 Duer on Ins.
245 ; *Murray* v. *Hatch*, 6 Mass. 465, 467, 477 ; *Meres* v.
*Ansell*, 3 Wils. 275 ; *Loring* v. *Gurney*, 5 Pick. 15, 17 ;
*Constable* v. *Noble*, 2 Taunt. 403 ; *Payne* v. *Hutchinson*, 2
Taunt. 405, note.   In the *Taunt. Cop. Co.* v. *Merch. Ins. Co.*
22 Pick. 108, cited for the plaintiffs, the attempt was to con
trol the settled meaning of the terms of the policy.   *Alitei*,
in the case at bar.   *Ougier* v. *Jennings*, 1 Camp. 505, note
(*a*) ; *Lowry* v. *Russell*, 8 Pick. 360 ; *Parrott* v. *Thacher*,
9 Pick. 426.   The plaintiffs were acquainted with the usage
at New Bedford, as appears by a case on the same policy.
The plaintiff's knowledge of the defendants' usage binds
them ; and they knew of this usage, as appears from the settle-

38 *

ment of a former voyage. If the cargo had not been insured, can there be any doubt, that the risk terminated on the mooring at anchor twenty-four hours in safety? In *Gray v. Gardner*, 17 Mass. 188, 190, Parker, C. J., says: " The vessel is coming until she drops anchor, or is moored. She may sink, or take fire, and never arrive, however near she may be to her port."

*Loring*, in reply. This is an attempt to explain words in a policy, which have received a meaning, that has been adopted and practised upon for the whole term of marine insurance. See 1 Phillips Ins. 454, as to covering goods in lighters, though insured " on board the vessel." See also *Coggeshall* v. *The Am. Ins. Co. of N. Y.* 3 Wend. 283 ; 2 Phil. Ev. 83.

FLETCHER, J. These were actions of assumpsit upon policies of insurance upon the ship Joseph Meigs and catchings on board the same, commencing the risk on the 14th day of October, 1845, at noon, to continue on and during her voyage, and back to Mattapoisett, " on the vessel, until she be arrived and moored at anchor twenty-four hours in safety, and on the property until landed."

By agreement of the parties, these cases were submitted to the full court on two questions, namely, whether the ship had " arrived " on the testimony of Captain Nye, and whether the usage testified to by Vassault, and others who swear to the same facts, if admissible in evidence, shows that the risk was ended. [Here the judge referred to and stated the testimony of captain Nye.]

From this testimony, it appears, that the witness took possession of the ship, as a pilot, on the morning of Saturday, June 20th, 1846. He expressly testifies, that his object and purpose was to bring the ship up to Long Wharf, at Mattapoisett, the same place at which he took charge of her on her going to sea. He brought the ship to anchor off Mattapoisett, about one third or one fourth of a mile within the harbor, and anchored in eighteen feet of water, at the usual place of anchoring ships of that class, for lightening to go to the

wharf; and he expressly testifies, that he brought her to an-chor there, because there was not water enough for her to go to the wharf. The ship drew sixteen and a half feet. At the top of the tide, he could carry twelve and a half feet to the wharf. The ship, therefore, could not reach the wharf till she was lightened, and more or less of the cargo taken out. The ship remained where she first anchored on Saturday till the next Thursday. On Monday, they sent down the royal yards and masts, and the top-gallant masts and yards, and unbent all the sails, except the three topsails, spanker and jib ; and it is expressly testified, that these were left to work the ship to the wharf with, and were all sufficient for that pur-pose. On Tuesday, a lighter came off, and, during that day and Wednesday and the morning of Thursday, was occupied in taking out the cargo. On Thursday, the ship was got under weigh and moored two or three hundred yards nearer the wharf, and not being able to move farther, on account of the wind, she was brought to anchor again. On Friday, some more of the cargo was taken out, and the ship was moved farther towards the wharf; but got only two or three hundred yards, on account of the wind. On Saturday more of the cargo was taken out, and efforts were made to get under weigh again, but failed in consequence of wind and weather. The witness, the pilot, between one and two o'clock, left the ship, intending to return in the evening at high water, if there was a prospect of getting the ship to the wharf. The witness told the third officer, that if there was any chance at high water, he wanted to get the ship to the wharf, and wanted him to be there. The wind was unfavorable at high water, blowing right from the wharf, and when the wit-ness found there was no chance of getting the ship to the wharf, he returned to his house again, and the next he knew of the ship she was on fire. She burned to the water's edge and then sunk.

The case being submitted on the testimony of captain Nye, his statements must be taken to be true ; as they furnish the only facts upon which the question submitted, whether or not

the ship had arrived, can be determined.    He states, expressly, that the purpose and intention were to bring the vessel to Long Wharf; that her voyage was to terminate at that spot; that she was prevented from going directly to that place by the insufficient depth of water ; that she came to anchor at first upon making the harbor, not as having ended her voyage, and for the purpose of unlading her cargo, but merely to lighten the ship to enable her to reach her place of destination ; that the ship was making. her way to the wharf up to the time when she was destroyed ; and that at the time she was destroyed, she had not reached her place of destination at the wharf, but was endeavoring to reach it.    The voyage was a whaling voyage and back to Mattapoisett, and the risk of the defendants was to continue during the voyage aforesaid, on the vessel until she *be arrived* and moored at anchor twenty-four hours in safety.

It was maintained by the counsel for the defendants, in argument, that the ship had reached her destined place of unlading ; and several things, such as that the captain and most of the men had left her, and that she was dismantled. were referred to in support of this view.    This question might very fairly have been left to the jury, as a matter of fact upon the evidence in the case, but certainly is not open to discussion in the hearing before the court.    The case is submitted to the court, by agreement of the parties, upon the facts stated by captain Nye ; and one of the facts most expressly and distinctly stated by him is, that the destination of the ship was to Long Wharf ; that she came to anchor not to unlade but to lighten, in order to enable her to get to her place of destination ; and that she was making her way towards the point to which she was destined, and before reaching it was destroyed.

The simple question, therefore, is, whether the ship, being destined to the wharf as the place of unlading, but being obliged to anchor after coming within the harbor, for the purpose of lightening, to enable her to get up to the wharf, — there not being sufficient water for her to reach the wharf

with the cargo all in, — is to be considered as having arrived within the meaning of the policy, upon reaching the place of anchoring for the purpose of lightening.

The vessel is insured and protected by the policy during the voyage, and till she has arrived. But when is the voyage ended, and when has she arrived? It is not usual to specify any particular wharf or spot in the destined port, at which the voyage shall be ended. It would be impracticable to do so, as it could not be foreseen at what precise place it would be desirable to unlade; nor would it be known at what particular place a suitable berth for the ship could be obtained. It is usual, therefore, in policies, to designate generally the port at which the voyage is to end. But the general term port or harbor embraces a large extent, varying, of course, in different harbors, many miles of navigation, and generally the most difficult and dangerous navigation. It surely cannot be the intention of parties, that a ship shall not be insured by the policy, while she is passing through the perils of harbor navigation, occupying of course various periods of time, as winds and tides and other things may be favorable or unfavorable. Reaching the harbor, therefore, cannot be arriving within the meaning of the policy; and if it do not mean that, it must mean that particular place or point in the harbor, which is the ultimate destination of the ship. Until that point is reached, the voyage is not ended, and the ship has not arrived; though she may be obstructed and delayed in her progress through the harbor, and for want of water, or by adverse winds or other causes, be obliged to come to anchor and remain at anchor twenty-four hours, and to take out some portion of her cargo. While she is properly pursuing her course to the place of her ultimate destination, and of complete and final unlading, and until she reaches that place, and has been moored there in safety twenty-four hours, she is insured and protected by the policy.

This is very clearly the meaning and effect of the contract of the parties as contained in the policy. This view of the case is very fully supported by authorities. In *Taber* v. *Nye,*

12 Pick. 105, this court say : " It is perfectly clear, that by the returning to New Bedford, the parties meant to her destined place of mooring there, and not merely to the waters or territory within the limits of the town or port of New Bedford." So in *Samuel* v. *Royal Exchange Assurance Company*, 8 B. & C. 119, in the king's bench. This was an insurance upon the ship Salmon River, until she shall have arrived at London, and hath there moored at anchor twenty-four hours in good safety. The master was directed to take the ship into the king's dock at Deptford, and deliver her cargo there. On the 18th of February, the vessel arrived at Deptford, and was moored at anchor alongside a king's ship near the dock gates. On account of the ice in the river, she could not get into the dock, and remained at anchor from the 18th to the 27th of February, when the ice gave way and she was cast off from her moorings, and warped towards the dock. In consequence of a rope breaking she went ashore near the dock gates and was totally lost. It appeared, also, that many vessels laden with timber (as this vessel was) discharged their cargoes at the place where the Salmon River was moored. It was held, however, that the plaintiff was entitled to recover; that the place where the vessel was moored not being the place of her ultimate destination, the policy did not expire when she had been there in safety twenty-four hours; and as the vessel remained at her mooring on account of the ice, the underwriters were not discharged by the delay. The vessel here was insured to the port of London generally, and she arrived within that port, and was moored at anchor twenty-four hours in safety, and at a place, too, at which many vessels laden with timber, as she was, discharged their cargoes. Yet it was held, that the underwriters were liable, till she reached the particular place within the port to which she was destined. This case is strikingly analogous in its circumstances to the case under consideration, and is a direct and very strong authority in favor of the assured. The general doctrine of the case is, that when a vessel is destined to any particular dock or place

within the port of arrival, the underwriters are liable till she can by reasonable diligence reach that place in safety. The case of *King.* v. *The Middletown Insurance Company*, 1 Conn. 184, and that of *Dickey* v. *United Insurance Company*, 11 Johns. 358, both support the views taken by the court in the case at bar, but it is not necessary to consider them in detail. The case of *Angerstein* v. *Bell*, Park on Insurance, 35, referred to by the counsel for the defendants, does not conflict at all with the cases which support the claim of the assured.

The usage referred to in the report can have no influence in the decision of this case. In the first place, the usage refers only and exclusively to the collection of the premium notes, and has no reference whatever to the payment of losses. Paying a premium note by the assured is a very different thing from the payment of losses by the assurers. Besides, as the policy was on the vessel and cargo, and it was admitted that the policy continued on the cargo, it could not be maintained that the usage proved a termination of the risk, at the end of twenty-four hours after anchoring within the port.

The conclusion is, that the vessel had not arrived, within the meaning of the policy, at the time she was destroyed.