A vessel was insured from *New-York* "to the port of *Sisal*, in the province of *Yucatan*, with liberty to proceed to one other port in said province, not to the southward of *Laguna de Terminos*, nor to the eastward of Cape *Catoche*, and back to *New-York*." After going to *Sisal*, the vessel proceeded to *Silam*, to take in a cargo of mahogany, and anchored about 8 miles from the shore, in the open sea, there being no harbour, and was driven on shore in a gale of wind. *Sisal*, *Silam*, and other places, on that coast, though called *ports* are merely open *roads*, there being no harbours there; and vessels lie at anchor several miles from the shore, and land and take in their cargoes by the aid of boats; and the custom-house is at *Merida*, an inland town, a custom-house officer only being stationed at the places on the shore. It was *held* that the word *port* used in the policy, must be taken in reference to the subject matter; and though generally meaning a harbour, yet when applied to *Sisal*, and the other trading places on the coast of *Yucatan*, it meant only a *road* or anchorage place, for the purpose of unloading and loading cargoes. And that the insured was not bound to inform the insurers of these facts, as they must be presumed to know the nature and situation of the places to which the contract of insurance relates; the topography of the places mentioned in the policy being matter of general knowledge, with which every underwriter takes upon himself to be acquainted.

# DE LONGUEMERE *against* THE NEW-YORK FIRE INSURANCE COMPANY.

THIS was an action on a policy of insurance, on the ship *Etheta*, dated the 14th of *August*, 1810, for 2,000 dollars, at a premium of 6 *per cent.* "at and from *New-York* to the port of *Sisal*, in the province of *Yucatan*, with liberty to proceed to one other port in said province, not to the southward of *Laguna de Terminos*, nor to the eastward of Cape *Catoche*, and back to *New-York*."

The cause was tried at the sittings, in the city of *New-York*, on the 19th of *November*, 1812, before Mr. Justice *Spencer*.

The master of the *Etheta* deposed, that he sailed from *New-York* on the voyage insured, the 14th of *August*, 1810, the vessel being, in every respect, duly equipped for the voyage. He arrived at *Sisal* the 6th of *September*, and landed the cargo, except two boxes of china, and some boards. *Sisal* is an open roadsted, or port, having no harbour. Vessels lie some miles from the shore, or beach, and land and receive their cargoes by the aid of boats. The custom-house of *Sisal*, and also of *Silam*, is at *Merida*, an inland town, where all vessels are entered and cleared. On the arrival of the *Etheta* at *Sisal*, her pers were sent to *Merida*, and a permission obtained to land her cargo. On the 4th of *October* the *Etheta*, being well and sufficiently ballasted for the residue of her voyage, sailed for the port of *Silam*, in the province of *Yucatan*, having obtained from *Merida* a clearance for that purpose, and also a permit to take in a return cargo at *Silam*. On the 8th of *October* the *Etheta* arrived at *Silam*, and anchored about 8 miles from the shore, being the usual and customary place of anchorage, for vessels lying there, for the purpose of taking in cargoes. *Silam* and *Sisal* are ports of the same kind; there being no *harbour* at either place; and vessels lie from 8 to 10 miles from the shore, for the purpose of landing and

ALBANY,
Jan. 1813.

DE LONGUE-
MERE
v.
N. Y. FIRE
INS. CO.

receiving their cargoes.   They are both, however, called and known as ports, and a custom-house officer is stationed at each place.   There are a few houses at *Silam*, near the shore, the town being 3 leagues back ; and there is a small house on the shore, near the water, in which the custom-house officer resides, and a signal house to denote the port.   On arriving at *Silam*, the captain delivered to the custom-house officer the clearance and permit obtained from *Merida*, and was thereupon permitted to take on board a cargo of *logwood*, which had been previously contracted for, by the consignee, and was ready for delivery ; the export duties for it having been paid by the consignee at *Merida*. The weather was so boisterous that no part of the cargo could be laden on board until the 17th of *October*, when a part was taken on board.   The weather again became so boisterous as to prevent any further lading of the ship ; and on the 23d of *October*, the ship was driven on shore, in a most violent gale of wind, which continued for two days, and was wholly wrecked and lost.

On his cross-examination, he stated that there was no harbour at *Silam*.   A sand beach stretches along the coast.   There is no inland bar, or other shelter, or protection from storms, and the anchorage is bad.   The *Etheta* lay off, in the open sea, about 9 miles from the shore.   She took in a ballast of sand at *Sisal*, and drew 12 feet water while she lay off *Silam*.   When she began to take in logwood, part of the ballast was discharged, but the ship was an inch deeper in the water than before.   *Campeachy*, about 180 miles from *Silam*, is a large city, and there is good anchorage there.   The navigation is more dangerous on this coast in the autumn, than at other seasons.   The northerly winds then blow with most violence.   The wind usually begins at the S. W. and vessels usually put to sea, as the proper course for safety, in case of a storm.   The captain would have put to sea before the wind changed, but he thought it safe while the wind was at N. E. and the sudden change to the N. and W. was deemed extraordinary ; and as it then blew directly on shore, it was impossible to put to sea.

Several other witnesses deposed to the same facts.   It was stated, that *Augostura, Rio Legartos* and *Silam*, and other places where vessels are permitted to take in cargoes, are all open roads.

The defendants offered to prove that the trade to *Yucatan* was a recent trade, and by permission only of the *Spanish* government ; that the consignee resided at *Merida*, and that the course of the

ALBANY,
Jan. 1813.

DE LONGUE-
MERE
v.
N. Y. FIRE
INS. CO.

voyage and the manner of loading vessels on the coast was known to the plaintiff, who was bound to communicate the information to the defendants; that had the defendants known the facts, they would have computed the premium at 18 *per cent.* This evidence was objected to by the plaintiff's counsel, and rejected by the judge.

The defendants produced a witness, who testified to a conversation between the master of the *Etheta* and one of the defendants, in which, being asked why he did not put to sea when the storm arose, the master replied, that so much ballast had been taken out, that the ship would not bear her canvass.

The judge left the fact of seaworthiness to the jury, with an opinion that the weight of evidence was in favour of the plaintiff; and on the other points raised in the cause, he charged them that the plaintiff was entitled to recover for a total loss. The jury found a verdict for the plaintiff accordingly.

A motion was made to set aside the verdict, and for a new trial.

*S. Jones,* jun. for the defendants, contended, that the place called *Silam,* where the vessel was lost, was not a *port,* within the meaning of the policy; and that the ship was not in the due prosecution of the *voyage* described in the policy, at the time she was lost. *Silam* was not, in the ordinary, natural and proper sense of the term, a *port,* which signifies a *harbour,* or safe station for ships. A *roadsted* is an open port; but *Silam* is not even a *roadsted;* it lies on a naked beach, or shore, exposed to the open sea. If the term *port* is to be considered as at all applicable to *Silam,* it must be on the ground of usage; and that usage must be proved to be established and notorious, so that all persons, in making their contracts, must be presumed to have reference to such well known acceptation, or usage.* This was a recent trade, and it ought to appear that the usage was known to the defendants as well as the plaintiff.

* 1 *Marsh. on Ins.* 186. 1 *Caines' Rep.* 45.

2. The vessel was not seaworthy; for she had not on board, at the time of the loss, a sufficient quantity of ballast. The verdict ought to be set aside, not only for the misdirection of the judge, but as against evidence.

*Colden* and *Hoffman,* contra, contended, that the term *port* had a political and commercial sense, well known in the commercial world, as a place of entry, where the customs are collected,

without any regard to the natural signification, as being a *harbour*, or place of safety. *Silam*, therefore, may be a *port*, though not a *harbour*. Insurers are bound to know, as much as the insured, the nature and course of the trade.* It cannot be pretended that there was any concealment in this case. The insurers must be presumed to know the geographical position, and relative situation of the places described in the policy, or comprised in the voyage, as well as the insured. It could not be requisite for the plaintiff to inform the defendants of facts of which they cannot be presumed ignorant. Besides, *Sisal* is called a *port* in the policy; and it is in evidence that *Silam* is a place perfectly similar. The defendants cannot be allowed to say that these places are not *ports*, after calling them such in the policy.

Whether the vessel was seaworthy or not, was a question of fact for the jury to determine, and they have decided it.

*Wells*, in reply, insisted that the term *port*, in its ordinary and legal acceptation, meant a place of *safety* for vessels, as contradistinguished from the open sea. It is said, that as *Sisal* is called a *port* in the policy, the defendants are estopped to say that *Silam*, where the vessel was lost, was not a *port*, because it was proved to be like *Sisal*. But because *Sisal* is called a port in the policy, it does not follow that every other place not so described, is to be considered as a *port;* and as the vessel was not lost at *Sisal*, the plaintiff is not helped by the description of that place in the policy.

Again, as *Sisal* is called a port in the policy, it ought to answer to that description; for though there may be a place bearing the name of *Sisal*, yet if there is no *Port Sisal*, the policy is void, for want of a *terminus ad quem*, by which the voyage is to be defined. If a vessel was to be insured from *London* to *Port Rockaway*, that description would not make *Rockaway* a *port;* it being well known to be only a beach on the south side of *Long Island*. Would not the policy be void, because there was no such *port ?*

Again, it is said that these places are reputed and called ports in the country in which they are situated, and it is the usage of trade so to consider them. But there was no sufficient evidence of a commercial usage on the subject. The evidence of reputation and usage ought to be very strong, in such a case. The trade between *New-York* and *Yucatan* was recent, and none of the witnesses had been on the coast before. The rule is well laid

ALBANY,
Jan. 1813.

DE LONGUE-
MERE
v.
N. Y. FIRE
INS. CO.

* *Marsh. on Ins* 252. 258.
*Doug.* 492. 2 *Caines' Rep.* 155.

ALBANY,
Jan. 1813.

DE LONGUE-
MERE
v.
N. Y. FIRE
INS. CO.
* 1 *Caines'*
*Rep.* 45.
† *Vallance* v.
*Dewar*,
*Park*, (6th
edit.) 606.

down in *Smith* v. *Wright*, that "the true test of commercial usage is, its having existed a sufficient length of time to have become generally known, and to warrant a presumption, that contracts are made in reference to it."* The assured are bound to communicate to the insurers what they do not know, and what the assured do know.†

The agent of the plaintiff resided at *Merida*, and the plaintiff must have known the situation of those places, and the course of the trade, and ought to have communicated the information to the defendants. Had they known the manner of taking in cargoes on that coast, they would have demanded a much higher premium. In all cases where the insurer has been held bound by a usage of trade, it has been found by a jury, on competent evidence, positively to exist.

The ship was not seaworthy, for had she been kept properly ballasted, she might have gone to sea, when the storm commenced, and thereby been saved. Two witnesses testified, that the master, on being first questioned, declared he might have gone to sea had the ship been sufficiently ballasted.

KENT, Ch. J. The principal ground of the motion is, that the place where the ship was lost was not a *port*, within the meaning of the policy, and that the ship was not in the due prosecution of the voyage when lost. The voyage insured, was from *New-York* "to the port of *Sisal*, in the province of *Yucatan*, with liberty to proceed to one other port in said province, not to the southward of *Laguna de Terminos*, nor to the eastward of *Cape Catoche* and back to *New-York*." The ship had arrived at *Sisal*, and had proceeded to *Silam*, in the province of *Yucatan*, and within the specified limits, and was there lost by a peril of the sea. It was in proof that *Sisal* was an open roadsted, or port, having no harbour; vessels lying some miles from the shore, or beach, and that they land and receive their cargoes by the aid of boats. The custom-house of *Sisal* and of *Silam* was at *Merida*, an inland town. That the ship, when the storm came on that destroyed her, was at anchor at *Silam*, about eight miles from shore, being the usual and customary place of anchorage for vessels, when they lie for the purpose of receiving a cargo on board. That *Sisal* and *Silam* are ports of the same kind, and both are reputed and known as ports, and a custom-house officer is stationed at each place.

The parties to the policy are to be presumed to have been ac-

quainted, at the time of the subscription, with the nature and situa- ALBANY,
tion of the places to which the contract relates. The under- Jan. 1813.
writer need not surely have been told the state of the coast of De Longue-
the province of *Yucatan,* nor the topography of *Sisal.* These Mere
are general topics of knowledge, of which every underwriter takes v.
N. Y. Fire
Ins. Co.
upon himself to be informed. The word *port,* in the policy, must
be taken in reference to the subject matter to which it is applied.
It may generally mean a harbour, or shelter to vessels from
storms: (*a*)

> ————*Insula portum*
> *Efficit objectu laterum, quibus omnis ab alto*
> *Frangitur, inque sinus scindit sese unda reductos.*

But when the term is applied to *Sisal,* or any other trading
place on the coast of *Yucatan,* it cannot mean such a harbour,
for it is well known, and was proved in this case, that there
are none such on that coast. *Humboldt* says that there is
not, properly speaking, a port, on the whole eastern coast of *New
Spain.* The word was used here to designate landing places, at
*Sisal* and elsewhere, within the prescribed limits, where ships
usually delivered and received their cargoes. It is frequently
defined, in the books, in this commercial sense, without any parti-
cular reference to its fitness for naval security. *Molloy* (b. 2. c.
14. s. 8.) defines a port to be a public place, to which the officers
of the customs are appropriated.

It would be most extraordinary if the policy could not protect
the vessel at the usual anchorage place at *Sisal,* because there was
not a safe and commodious harbour there. The defendants took
upon themselves the risk of the vessel while at *Sisal,* and one
other such port in *Yucatan,* with all the inconveniences of such an
open and exposed shore, equally as they assured the extraordinary
perils, if any, of the navigation of the *Mexican* sea. If *Silam*
was a port of the same kind with that of *Sisal,* having only a
practicable and usual place for anchorage, and loading and unload-
ing of cargoes, it came within the description in the policy, which
was to the port of *Sisal* and " one other port" on that coast. The
*one other* port did not mean a better port, either for conve-

(*a*) See *Hargrave's Law Tracts,* v. 1. 46. where Lord *Hale,* in his *Treatise de
portibus maris,* defines the several terms *road, haven, port* and *creek.* " A *haven* is
a place for the receipt and safe riding of ships, so situate and secured by land circum-
jacent, that the vessels thereby ride and anchor safely, and are fully protected, by
the adjacent lands, from dangerous or violent winds." " A *port* is a *haven,* and
somewhat more."

ALBANY,
Jan. 1813.

DE LONGUE-
MERE
v.
N. Y. FIRE
INS. Co.

nience or safety, but another of the same kind. And, in fact, as the case proves, the ports were all of the same nature, the province affording no better; and they were used and known as ports, for all the purposes of external commerce. Clearly, then, the vessel was under the protection of the policy while at the usual anchorage, and engaged, in the usual way, in taking in her cargo at *Silam.*

. This point being disposed of, the others are not of much moment. The parol evidence offered by the defendants was properly overruled. The plaintiff was not bound to communicate to the defendants his knowledge of *Sisal*, and of the other ports or landing places in *Yucatan.* These were matters of fact and of general notoriety, equally open to the knowledge of both parties, and which both must be presumed equally to know. Whether the rate of premium might not have been higher, if the defendants had sufficiently informed themselves of the nature of the voyage, is a point not open for inquiry, so long as there was no undue concealment on the part of the plaintiff. The rate of premium may be resorted to as one guide to interpretation, when interpretation is wanting, but when the voyage is described with sufficient certainty, it cannot be admitted to vary the sense. As to the seaworthiness of the ship, it was a question of fact submitted to the jury, and there is no sufficient ground on which to question the justness of their conclusion.

*Per totam Curiam.*                    Motion denied.