The Mer. & Man. Mutual Ins. Co. *vs.* The Washington Mutual Ins. Co.

In General Term—April, 1855.

Before STORER, SPENCER, and GHOLSON, Justices.

THE MERCHANTS' and MANUFACTURERS' MUTUAL INSURANCE CO.
*vs.*
THE WASHINGTON MUTUAL INSURANCE CO. : plaintiffs in Error.

1. It is not sufficient to aver in a plea to an action upon a policy, that when the application for insurance was made, the insured concealed a fact material to the risque and which would have increased it if known; it must also appear, that the insured knew of the existence of the fact, and that the fact itself was not open and notorious at the time to all parties.

2. It is not every fact, within the knowledge of the insured that he is bound to disclose, and if such facts as the law will require him to disclose are within the knowledge of the insurers, or so connected with the subject insured, that his knowledge may be fairly inferred, the allegation of concealment is unsupported.

3. While the utmost good faith is required of both parties to the contract of insurance, the same degree of good faith is demanded in the formation of all contracts and the same rule applies to all.

4. There is a more liberal rule applied in the construction of fire policies, than those issued upon marine risques; the one supposes there is more equality between the parties, as the means of knowledge are more within the power of each; the other regards those means as within the reach of the insured only; *Semble*:

5. A representation must be of an existing fact, if there is an intention only to do an act at the time the insurance is asked for and the policy issued, and the act itself does not take place until afterwards, there is no foundation for a false representation, the act done can only be set up as a breach of warranty.

6. Wherever, as in this case, it is sought to avoid a policy on the ground that the subject insured did not include *machinery* or a *drying apparatus* under the terms used in the application for insurance, the plea must state in what particulars the subject insured differs from the representation; the question is at last one of proof, and the facts to sustain the allegation, must be particularly set forth in the pleadings.

7. The occasional use of articles denominated hazardous, or the occupation of the premises insured for purposes called hazardous in the conditions annexed to the policy, will not avoid the policy if such an occupation was connected with the buildings insured; there must be a direct appropriation of the property to such use or purpose before the covenant is broken.

8. And if, during such occasional or temporary use, the property should be destroyed, the underwriters will still be held if there is no fraud on the part of the insured.

9. A plea setting up a breach of warranty on the part of the insured as to the subject insured, is not sufficient unless it clearly appears in what particulars the subject said to be insured, was different from what it actually was represented to be at the time of insurance; and the rule is the same when there is a continuing warranty imposed on the risque by the terms of the policy. The precise facts must be alleged, upon which the warranty is claimed to arise, and for the occurrence of which, the policy is claimed to be avoided.

10. The charges of the court will be regarded as a whole, and if upon comparing one with the other, the whole law is found to have been laid down, and all that could be claimed as law by the plaintiffs and defendants has been given to the jury, a Court of Error will not select detached portions and decide the case. They will look to all, and, by a comparison of every part, if possible, harmonize every clause, wherever a principle is announced or a rule prescribed.

11. Underwriters will not be permitted to express their opinions as to the nature of a risque whether it is more or less hazardous; like other witnesses they can only testify to facts. They do not come within the rule, that experts may testify in particular cases, and that permits men of professional science to give their opinion upon subjects connected with the arts.

12. A manufacturer may be asked to describe the machinery used in his particuler business, and what parts of it have been used in other places, and how long, and whether machinery of a particular kind connected with his business has not been in use, and where; it is a part of the history of his vocation, and may be said fairly to be within his knowledge; and his knowledge is like that we derive from the written history of the past, whether connected with trade, commerce, or manufactures.

Opinion of the Court by STORER, J.

The plaintiffs and the defendants at the time the cause of action is alleged to have arisen, were both incorporated companies under the laws of Ohio, and transacted business in Cincinnati.

On the 26th of October, 1847, the plaintiffs, having previously taken a fire risque of $8000, for the benefit of D. White & Co., on stock of flour, grain, and cooperage contained in their "stone and brick steam-flouring mill, with cement roof, and detached from all other buildings, situated in the city of Madison, Indiana, and known as the City Mills," applied to the defendants to re-insure $4000, or one-half the risque they had assumed. The proposition was accepted, and on the same day the defendants issued their policy, incorporating the same description of the property insured, as that which was contained in the policy held by White & Co.

The contract appears to have been entered into in good faith by both parties: the risque was taken in the

410 SUPERIOR COURT OF CINCINNATI.

The Mer. & Man. Mut. Ins. Co. *vs*. The Washington Mut. Ins. Co.

ordinary course of business, neither the insurer nor the insured having any other knowledge of the premises insured, than the description thereof furnished by the original applicant. No exception was taken to the character of the risque, and no inquiries made, so far as the case is exhibited by the defendant, requiring of the plaintiff a more definite statement of the risque, or description of the property insured. It is not denied, but that the plaintiffs disclosed to the defendants their whole knowledge of everything material to the risque, or that any representations were made, other than those embraced in the description contained in the policy. The property insured was destroyed by fire, within the period for which the risque was taken, and the loss afterwards adjusted by the plaintiff with White & Co. At the time of the adjustment the plaintiffs acted, as they contend, with perfect fairness, and paid as underwriters, no more than they believed their contract bound them to pay; they claimed no indemnity for any fraudulent concealment, false representation, or breach of warranty on the part of White & Co. as they did not assume that any such grounds of defence existed; and having discharged their obligation, they applied to the defendants, to pay the amount of the re-insurance.

To this application, they were met by a refusal, on the ground that at the time the policy was issued by the defendants to the plaintiffs, instead of the premises in which was the property insured, being simply a "steam flouring mill," and no more, that there was in addition under the same roof, and in the same building, "a kiln-drying corn meal mill, having all the machinery, etc. for drying corn meal:" that this additional mill and machin-

ery, were no part of the original subject intended to be insured, that it greatly increased the risque, and if known to have been a part of the application for insurance, would have enhanced the premium.

As a consequence of this refusal, this action was brought in the former Superior Court of Cincinnati, several years since, where it was pending at the time that Court went out of existence under the new constitution. It was then transferred to the Court of Common Pleas, where it remained until removed into this Court, the past year.

The policy being under seal, the declaration was in covenant, and the defendant filed in the Court where the suit was brought, the general issue, and seven special pleas, which presented in different forms, but substantially for the same purpose all the questions involved in the defence. To the second, third, and sixth pleas, the plaintiffs demurred; and the court sustained the demurrers; to the sixth and seventh pleas there were also demurrers filed, and to the eighth plea three replications. These demurrers were overruled, and leave given to reply; replications were accordingly filed. The defendant demurred to the second and third replications to the eighth plea, which demurrers were sustained: these replications were afterwards amended, to which the defendant again demurred, and while the record thus existed, the proceedings were transferred to this court.

At the last December Term, Judge Gholson in special session overruled the demurrer to the second replication to the defendants' eighth plea, and sustained the demurrer to the third replication; this was afterwards amended, and the defendants filed their rejoinder to both the replica-

tions. At the January Term the cause came on for trial before Judge Spencer, and after a very elaborate discussion, the testimony was submitted to a jury who found a verdict for the plaintiffs. To the rulings of the Judge in the admission, as well as the rejection of evidence, and his charge to the jury, exceptions were taken, which with the testimony offered, are fully set forth in the bill of exceptions accompanying the proceedings. A new trial was asked which was refused, and the defendants now seek to reverse the judgment of the Court at Special Term. Various causes have been assigned, but it will be found the questions at last resolve themselves into a few very intelligible, as well as practical principles.

It is claimed in the first place that the Court erred, in sustaining the demurrer to 2d, 3d, and 4th pleas.

The decision upon these demurrers was made by the Court, from whom the case was transferred to the Common Pleas, and we find it on the record as a part of the history of these complicated proceedings. As the law organizing this court authorized the removal of causes pending in the Common Pleas, and when the same are docketed, " they shall henceforth be considered in said Superior Court, and be proceeded in, as if the same had been originally commenced in that court, having regard to the former proceedings, as may be right and proper," we must hold, that all the subsequent proceedings in this forum are but steps in the same cause, and when the case is removed to our general term, by writ of error, it is our duty to look into the whole record, and examine, as well as adjudicate, if necessary, all the legal questions that have been decided at *nisi prius*. On any other view of the duty we feel to be thus imposed upon us, we cannot

perceive how it would be practicable to revise the opinions of the various Judges who have heretofore considered the cause in any of its aspects.

The second plea, to which the demurrer was sustained, avers, "that before executing the policy of insurance, the defendants received from the plaintiffs a written proposition for insurance, which is embodied in the policy, by the same description as there represented; that the proposition contained the whole and sole representation and description given by the plaintiffs to the defendants, of the property to be re-insured. The defendants therefore say, that the property, instead of being a stone and brick flouring mill, and no more, was at the date of the policy, used not only as and for a steam flouring mill, but also was used for a kiln drying corn meal mill, having all the machinery and fixtures usual and necessary therefor, and intended to be used during the time covered by the policy, and which was in actual use at the time of the loss by fire, which fact was wholly concealed by the plaintiffs from the defendants, and of which they had no notice or knowledge whatever, until after the alleged loss by fire, and which did and does materially increase the risk of insuring property in such a building, and would, if known, have greatly enhanced the premium of insurance, or have induced the defendants to have declined it altogether."

The object of the plea unquestionably is to present the question, whether a material fact was concealed by the plaintiffs, at the time the proposition was made for the re-insurance, that they were bound to disclose; and the sufficiency of the allegations to make a prima facie case, we are now to consider.

We are relieved from deciding upon the weight of tes-

timony, as well as what would be sufficient testimony in such a case, to prove the allegations of the plea; they are all admitted by the demurrer, and we take for granted that they could have been established.

There are several objections to the plea, which need not now be considered; one is, that it is not averred the kiln drying corn meal mill was in use, or had been in use, at the time the policy was issued, or until the loss took place; the other is, that it is not distinctly stated that the plaintiffs concealed what it was proper they should have disclosed, at the time the proposal for insurance was made.    These allegations are both important, and in a proper case we should hold that great certainty would be required in the statement of the facts, upon which the charge of concealment depended.

It is sufficient that we find a fatal defect in this plea, which not only enables us to sustain the ruling of the Judge, who tried the demurrer, but will indicate our opinion upon other questions involved in the determination of the issues of fact at special term.

On a careful examination of the plea, it will be seen there is no averment, that the plaintiffs knew at the time they made the proposition to reinsure, or at the time the policy issued, or even at any time, that the subject insured contained the objectionable articles to which we are directed by the plea.

It is very clear that there can be no wilful concealment of a fact, unless the party, whose duty it was to disclose it, knew of its existence; and it would be difficult to draw a distinction between wilful and accidental concealment; for these two classes embrace, it is believed, every possible case, where a *suppressio veri* can be said to exist.    It is

equally fatal, where a material fact is withheld, that the insurer had a right to know, whether it was designedly or inadvertently omitted to be stated by the insured; but if he has nothing to disclose, if he relates all that he knows of the risk, he cannot be regarded as concealing what it was not in his power to have told.

The idea of suppressing the truth, presupposes the party committing the act knew that the fact alleged to be concealed existed, and concealment is but suppression.

Lord Mansfield, in his celebrated judgment in Carter *vs.* Boehm, 3 *Burr.* 1909, places his opinion on the ground we have indicated.

It was there held, that "concealment was the suppression of a fact within the knowledge of the party, which the other had not the means of knowing, or is not presumed to know." This definition is universally adopted by the writers on the law of insurance. 1 *Phillips on Ins.* 214; 1 *Arnauld on Ins.* 436; 2 *Duer on Ins.* 398, 399; *Park on Ins.* 174, 178; *Hughes on Ins. Am. ed.* 265, 266; *Ellis on Fire & Life Ins.* 38, 39; *Angell on Fire Ins.*, § 182 *et seq.*; *Smith's Mercantile Law* 488.

And this is the construction given in Howell *vs.* Cin. Ins. Co., 7 *Ohio* 282. We need not refer to the numerous decisions in England and the United States, where the same ground is assumed as the foundation of the principle. They present an uniform series of adjudications affirming the rule, and in every case we have examined, it is held, where there is no knowledge, there can be no concealment.

That there should have been a doubt as to the principle, is matter of surprise. It does not prevail alone in the law of insurance, but becomes an important element,

affecting the obligation of all contracts. Whenever a duty is to be performed, or a right sought to be enforced, equity as well as law requires that neither party should obtain an unfair advantage by the suppression of the truth, or the assertion of that which is false; both are regarded as fraudulent, and as there can be no criminal imputation, where the intent to do the wrong does not exist, there can be no such intent where there is no knowledge of the fact charged to have been concealed. *Story's Eq.* §§ 204, 205, 206; 2 *Kent, Lec.* 39, p. 481; 2 *Bro. Chy.* 424, Fox *vs.* Macrath; 1 *Jacob* 178, Turner *vs.* Hervey; 3 *B. & C.* 605, Pedock *vs.* Bishop.

In 13 *Meeson & Welsby* 155, Elkin *vs.* Jansen, the doctrine is very fully discussed and the direct question considered; the defence was that the insured had not disclosed material facts, the plea setting forth that the plaintiff "wrongfully and improperly concealed from the defendant certain facts and information, which the plaintiff then knew and had received."

It is claimed, however, that the facts stated in the plea, as they are alleged to have been concealed, *ex vi termini* import, that the party suppressing them knew of their existence. There cannot be, it is argued, any other legitimate inference drawn from the premises, and upon general demurrer every deduction must be made from the averments in the plea, that the language will rationally warrant. If we admit the rule, and it is but the ordinary legal exposition of all pleading, we find no allegation that any fact was concealed that these plaintiffs were under a legal or equitable obligation to communicate, and which the defendants had the right not merely in *"foro conscientiae,"* but *"juris de jure"* to know. 1 *Story's Eq.* 204.

It is not every fact within the knowledge of a contracting party that he is bound to communicate. If the underwriter is bound to know what is not expressly stated, as ordinarily connected with the subject insured, or if the subject said to have been concealed, publicly and notoriously existed, so that there could have been practically no suppression of the fact, we cannot think the doctrine urged by the defendants is applicable. Chancellor Kent, in his 39 Lecture, 2 vol. *Com.* 382, lays down the principle very broadly, that the duty " to communicate their knowledge to each other is binding upon both parties to a contract, provided the facts known are material, and they are not open, naked, or equally within the reach of observation." And this is but the application of the law governing the relations of vendor and vendee. If the defects in the article sold be open equally to the observation of both parties, the vendor is not required to aid and assist the observation of the vendee ; 2 *Kent's Com.* 484. The policy of the law certainly is to administer relief to the vigilant, and to put all parties upon the exercise of searching diligence, and there can be no just distinction as to the application of the rule, between contracts of insurance and other commercial undertakings. We hold good faith to underlie all agreements, and in the same degree must exist in all. The term *"uberrima fides"* is often quoted to distinguish different classes of contracts, but the foundation of each is the same, and a want of honesty in the parties to either, must equally invalidate both.

It has been held, that the same strictness ought not to be required of the insured in a fire policy, as when he is a party to a marine risk, and there is a very plausible reason to support the assumption ; for where the subject

insured is open to the inspection of the insurer, and may be minutely examined, it may well be regarded as placing both parties more upon equal terms, than when insurance is asked upon a vessel at sea, or in a distant port; in the last case it must naturally be supposed that the insured alone has all the knowledge of the subject; in the former, it may be common to him and the underwriter. The principle to which we have alluded, pervades the whole doctrine of warranty, and we find there its apt illustration. By the common law, a warranty will not cover defects that are plainly visible to the senses; for fraud or deception could not be predicated upon that which the vendee knew at the time he purchased did not exist; and the assertion that it did, if it could create a liability, would be to sustain by falsehood an action to enforce it.

In this plea, there is no averment that the subject concealed was not at the time the policy issued, open and accessible to ordinary observation; it is not claimed that it was disconnected from the flouring mill, or otherwise concealed from view. It is moreover charged to have been used in the building, as a part of the business transacted there by the insured, and it is not averred that it was a matter that the insurer could not equally as well know as the insured.

We cannot then perceive, admitting the full force and effect of the allegations of this plea, that they presented a legal defence to the action, and we must accordingly hold, that there was no error in sustaining the demurrer.

The third plea is substantially the same as the second, with the exception that the plaintiffs are charged with having falsely described the property insured, instead of concealing its real character. The allegation here assumed

forbids the idea of any suppression of facts, or any war-
ranty even that they then existed, or would afterwards
exist.

A representation to be false, presupposes that the sub-
ject insured was substantially different from the descrip-
tion furnished at the time the risque is taken; and it must
be a substantial difference, one that affects the contract,
and so changes the character of the agreement, that the
thing actually insured is not that which was intended to
be. 2 *Peters' Rep.* 49, Columbia Ins. Co. *vs.* Lawrence;
4 *Hill Rep.* 334, Alson *vs.* Mechanics Mutual Insurance
Co., 16 *Wend.* 385; Ætna Ins. Co. *vs.* Tyler. And the
cases seem fully to establish the doctrine that the rep-
resentation need not be wilfully or designedly made;
if voluntarily made, whether the party believed it to be
true, or carelessly made it through error or mistake, the
result is the same, there is no mutual assent of the par-
ties to the agreement.

But it is not denied in this plea, that the kiln drying
mill was not a part of, or properly connected with a
flouring mill, and therefore not within the meaning of the
policy. It may well consist with the honesty of the
transaction, that what is claimed not to have been in-
sured, was in fact, if not identical with, yet very natur-
ally attached to the flouring mill. In the progress of
the arts it is impossible to foresee the limit in mechan-
ical improvements; new appliances are invented as the
necessity exists for their introduction, and what is the
condition of all manufacturing establishments as to the
power employed, the construction of machinery, and the
mode of operation, are general facts which any underwriter
is supposed to know. They are a part of the daily history

420 SUPERIOR COURT OF CINCINNATI.

The Mer. & Man. Mut. Ins. Co. *vs.* The Washington Mut. Ins. Co.

of all industrial pursuits, and those who take risks, are bound to acquaint themselves with every thing connected with the business, occupation, or employment they may insure. 3 *Burr.* 1905, Carter *vs.* Boehm; 1 *Phillips on Ins.* 233; 1 *Douglass* 251, Plancher *vs.* Fletcher; 5 *Gill & Johnson* 159, Maryland & Phoenix Ins. Co. *vs.* Bathurst; 10 *Johns.* 120, Delonguemere *vs.* N. Y. Firemen's Ins. Co.

As the materiality of the fact represented is placed directly in issue, it is but just that it should be clearly stated in the plea, in what such materiality consisted, and the question involves at once the other important fact, whether the kiln drying apparatus was a part of the original insurance, or not. The proof upon the trial must sustain the allegations of the plea, and *e converso*, those allegations should contain such a statement of facts, as, if true, would constitute a valid defence to the action.

In addition to the defect we have thus indicated, it does not appear by the plea, that the kiln drying mill was in actual use at the time the representation was made; it is merely stated, that it was in the building, and intended to be used. Now it cannot be claimed, that there can be a representation of an intention only; it must necessarily apply to a fact *in esse*, not only substantially inconsistent with the subject insured, but so materially varying the risque, that the policy did not attach at the time it was issued. Can it then be argued, that the existence only of matter not insured, in a passive state, can be held to increase the risque, unless it is specially averred that the materials of which it was composed were so combustible that the peril was increased? The only danger seems to depend upon the power by which the additional machinery was propelled, or the fire-heat necessary to dry the arti-

cles in process of manufacture, and surely, if neither are employed, there is no reasonable ground of complaint.

There must be something in being to which the false affirmation can apply, and should we grant that the subject in form was actually present, does it follow that the representation is false? We cannot so understand the rule, nor can we feel the force of any argument however ingenious, that may be made to sustain such a position. We can find no error in the ruling of the Court to this plea.

The fourth plea to which the demurrer also was filed, states the facts set forth in the second and third pleas, and charges "that the plaintiffs warranted that during the continuance of the risk, the property insured should only be used as and for a steam flouring mill, and for no other purpose. Yet the same was at divers times during the risk, and at the time the loss occurred, used for purposes different from those contemplated by the policy."

It will be perceived, that there is no averment in the plea, that the use of the machinery complained of increased the risque, or was not a part of the flouring mill; the allegation is that the warranty was made upon the faith that a flouring mill only was to be insured, and the implication is sought to be made, that the kiln drying apparatus was not connected with the manufactory of flour. There is no affirmation of any fact by which such an implication can be sustained, nor does it appear in what manner the subject claimed by the plaintiffs to have been insured, really differs.

We admit, that express warranties, however material may be the act to be done or omitted by the insured, are rigidly construed. The parties may make their own

contract, and both are equally bound by whatever conditions they may have imposed upon each other. *Ellis on Fire and Life Ins.* 28; *Angell on Fire and Life Ins.* 142, 144.

But it cannot be inferred that the warranty is broken, unless a case is made in the plea, inconsistent with the clear terms of the warranty. A case must be stated that will entitle the underwriter to regard the contract as at an end.

We cannot therefore perceive, that there is any error in the ruling upon the demurrer to this plea.

The fifth plea states, that the policy contained a provision, obligatory upon all parties, "that if the building, or any part of it, should be used for the carrying on any business or operation denominated hazardous in the conditions annexed thereto, unless therein otherwise specially provided for, or thereafter agreed to by the defendants and indorsed upon the policy, the same shall cease to be binding upon the defendants." That among the things denominated hazardous in said conditions, are included "all mills, manufactories, or mechanical operations requiring fire heat; and the defendants say, that after the making of the policy, and at the time of the loss by fire, and on divers days before that time, without any special permission therefor in the policy, or any agreement therefor by the defendants indorsed thereon, the said building was used for a kiln drying corn meal mill, which is a mill, manufactory, or mechanical operation requiring fire heat, and thus the policy ceased to be binding upon them."

The plaintiffs have also demurred to this plea.

The grounds we have taken in deciding the effect of the former pleas, apply with equal force to this. It is not

averred, nor does it appear in any part of the plea, that the mill, manufactory, or mechanical operation described, is distinct from or was not a part of the flouring mill: we have said we cannot imply the fact from the mere statement of the subject insured; that statement necessarily involves many particulars which the insured could not be required to enumerate, and we can with no more propriety infer that there is a substantial difference between the flouring mill, and the kiln drying corn meal mill, or that the latter is not an incident to or a necessary part of the former, than we can take notice of the complications in machinery, or the improvements in the form, adjustment, and application of the many parts of which it is composed. Whether the mill itself is constructed upon the plan of the insured, or that of others who claim to more novelty in invention, or economy in the saving of power, are matters that do not affect the argument.

The only practical question can be, are the subjects identical, or necessarily and usually connected, or are they distinct and separate: and its solution must depend upon the proof. A case then should be made, that the facts stated when admitted by the demurrer, should clearly bring the defence within the rule we have referred to.

The risque taken by the defendants was included within the very conditions set forth in the plea: it was of the class denominated hazardous, and it does not appear that the addition of the kiln drying mill rendered the risque more hazardous, or could have increased the premium.

There is another important fact in connection with this plea that it is proper for us to consider.

It is not the occasional use of the property insured, for other purposes than those specified in the policy that will

determine the risque. The use must be constant; it must be the actual carrying on of a trade or business, and even when by such occasional use, the property in use should be destroyed, if there is no fraud, the underwriters are held liable.

The habitual use of fire, or the ordinary deposit of hazardous goods, and not their occasional introduction for temporary purposes connected with the occupation of the property insured, we regard to be the true construction of the prohibitions in the policy. This was the ruling of Lord Tenterden in Shaw *vs.* Robbits, 6 *Adolph & Ellis*, 75, and of the same Judge, in Dobson *vs* Sotheby, 1 *Moody & Malk.* 90. See also Delonguemere *vs.* Tradesmen's Ins. Co. 2 *Hall,* 559; Moore *vs.* Protection Ins. Co. 16 *Shipley* 97; 20 *Conn.* 139, Billings *vs.* Tolland Mut. Ins. Co.

Here, we have no averment that the trade or employment excepted to was carried on as a part of the ordinary business of the flouring mill. The statement forbids any such inference, and no fraud is averred in the temporary use of the machinery it describes. We cannot then but hold that the fifth plea was insufficient, and the court decided rightly in sustaining the demurrer.

Before we examine the questions on the remaining pleas, as well as the exceptions taken to the rulings of the Judge who tried the case at bar, it is but just to recur to the situation the parties before the court, severally occupy.

The plaintiffs took a risque upon the same property and by the same description, for which, and upon which, they asked a re-insurance for a moiety of their liability from the defendants. A loss has occurred, the plaintiffs have paid it, and the defendants seek to rid themselves

of liability, on the ground that they did not understand the character of the property insured, at the time they issued the policy of re-insurance. It is not claimed that the plaintiffs knew more on the subject than the defendants, or that the application for re-insurance was variant in any particular from that made by White & Co. to the plaintiffs.

While we suppose the risque of re-insurance must depend upon the same principles that are applicable to the original risque, yet we cannot but feel that there is more favor to be extended to the underwriter who has in good faith taken a risque and immediately afterwards obtains re-insurance, than we should extend to the original parties. There is a manifest distinction between the situation of the owner of property knowing its actual condition, and having it in his power minutely to describe it, and an insurer of the property, living at a distance from it and relying solely for his guidance on the representations of the insured. While we would hold the re-insured to any fair and just liability, growing out of the contract with the re-insurer, we must nevertheless admit the distinction we have pointed out, holding it to be the proper exposition of the law as applicable to such a case.

The right of the underwriter to re-insure has been fully established by the American courts, though such a contract would not be sustained in England, by 19 *Geo.* 2, *ch.* 37 §4. 2 *Mass.* 176, Merry *vs.* Prince; 3 *Caines* 190 Hastie *vs.* De Peyster; 17 *Wend.* 362, N. S. Bow. Ins. Co. *vs.* N. Y. Fire Ins. Co.: 2 *Comstock* 235, Mutual Safety Ins. Co. *vs.* Pro. Ins. Co. And the true rule as evolved from these cases would seem to be, that the re-insurer may set up the same defence, when sued upon his con-

54

tract as the re-insured might interpose to an action upon the original policy.

Having disposed of the questions arising upon the demurrers, we will proceed to examine the other errors assigned.

It is claimed that the court erred in ruling out the several questions asked of C. W. West and others, by the defendants, as to the effect a kiln drying corn meal mill, would have upon the risque, and whether it was material to the risque or not.

The question to be decided by the jury at the trial, was whether the kiln drying corn meal mill, was appurtenant to or properly connected with the flouring mill, and the fact was susceptible of proof. If it should appear that the subject insured, embraced the subject claimed to have been excluded, it is immaterial whether the risque was increased or not, for we have already held that all the ordinary and usual machinery connected with the manufacture of flour, are in the estimate of the law, as much within the knowledge of one party as the other. To permit opinion only to be a substitute for the fact, and on such opinion to conclude that the risque did not attach, would reverse the order of legal procedure, and introduce a new rule in the adjudication of the rights of litigants.

In all proper cases, men skilled in the arts, or any particular trade, science or vocation, may be permitted to testify to explain the nature of the business in which they are engaged, and the essential element of their fitness to testify, is their knowledge of the facts they are called upon to explain. Here the witnesses appear to have been underwriters, and we cannot permit those who are so

vitally interested in contracts like this, to give their legal interpretation; we think it but just to reserve that power to ourselves, for upon the court rests the responsibility of deciding at last what the law of the case is.

The question is fully decided by our Supreme Court in 22 *Ohio* 453, Pro. Ins. Co. *vs*. Harmar, and we cheerfully adopt the very able opinion of Judge Ranney.

And this is we believe the only safe doctrine: it is so held in Durrell *vs*. Bedesley, *Holt* 285, where Chief Justice Gibbs said, "it is not a question of science upon which scientific men mostly think alike, but a question of opinion liable to be governed by fancy, in which diversity might be endless." See also 7 *Wend.* 78, Jeff. Ins. Co. *vs*. Cothead; 5 *B. & A.* 840, Campbell *vs*. Richards; *Burrows* 1905, Bochue *vs* Carter; 4 *Denio* 311, Fish *vs*. Dodge.

We think then the Judge properly refused to admit the testimony.

It is further objected that the testimony of Elstner was admitted, when it should have been rejected. It appears by the bill of exceptions that the witness was a miller and had been for many years; that he pursued his calling in 1846 and 1847, when the policy in this case was issued, and he was asked if from his personal knowledge, kilns for drying corn meal were, in those years, used in flouring mills in Indiana and Ohio. The evidence sought to be given by this witness was the proof of a fact, not his opinion, and the Judge might well have admitted it. We have already intimated that in every proper case, such testimony may be received.

The witness was also asked if he had any knowledge, from general reputation, that flouring mills existed with

kilns in them, at other places in 1846 and 1847.   The
question was objected to, but the Court permitted it to
be answered, and we think in so doing they acted rightly.
The knowledge of very many important details in the
business of commerce and manufactures consists in repu-
tation only.   The course of trade furnishes information
to the shipping merchant, as well as the underwriter, and
the artizan of the demand in foreign markets, as well as the
laws of supply by which exports are regulated and prices
maintained.   In a few cases the parties may have had
personal experience, but in the great majority they have
never visited the foreign port, or observed the practical
operation of the various modes in which commodities are
sold, or their equivalents realized; still an American mer-
chant, who has transacted for a long time important busi-
ness with his consignees in London, or Paris, or Peters-
burg, is competent to prove the ordinary customs of those
cities in relation to trade; what has for years regulated
the disposition of his own property in the hands of his
foreign correspondent, thus becomes a part of his daily
business, and may well be regarded for all the purposes of
evidence, as within his knowledge.   And the manufac-
turer at home may in like manner describe improvements
in machinery, new adaptations in its forms, and new results
from their use, whether the processes employed were actu-
ally observed by him, or not; the very nature of his vo-
cation places him in intimate relation with all the ordinary
means, by which similar pursuits to his own are carried
on, and the constant modification of the processes em-
ployed, are but the daily history of the progress of the arts.

Upon information like this courts have always relied;
for it is but the exposition of the principle by which we

can obtain any knowledge of the past, or even the present state of the world, in all and every case that is presented for our consideration.

When the question was discussed in 10 *Johns.* 129, De Longuemere *vs*. N. Y. Ins. Co., whether the term "port" applied to Sisal in Yucatan, which was geographically known to be but an open roadstead, Chief Justice Kent did not hesitate to refer in his opinion to Humboldt's Travels in New Spain, to learn the actual topography of the place, and quoted a beautiful couplet from a Latin poet, to describe the meaning of a harbor. We might refer to numerous illustrations of the rule in our ordinary practice, but we think the position assumed by the Judge is sufficiently vindicated.

It is also claimed that the Court erred, in giving the charges asked by the plaintiffs, and in refusing the second and fifth, asked by the defendants. The sixth, seventh, and eighth pleas presented issues of fact which were traversed, and though differing in their statement of the defence, the real question was whether the kiln drying corn meal mill was a part of or incident to a flouring mill, under the description contained in the policy. To this point the defence seems to have been directed, and we cannot permit a criticism upon the pleas themselves, or the replications, to conceal the real matter in dispute.

The plaintiffs asked the Court to charge, "that if the Jury should find the mill, referred to in the policy, was a flouring mill, used for grinding grain for food, the insured were authorized to manufacture corn meal in the building described in the policy, and the fact that the mill was used for that purpose at the time of the loss, would not bar a recovery.

It appears that testimony was adduced by both parties, and the fact was fully before the Jury to find what was the character of the property insured. It was competent for them to do so, it was their duty to do so before they could return a verdict: the defence assumed that the kiln drying mill was not insured, the plaintiffs claimed that it was; the whole controversy then turned upon the fact, what is a flouring mill? We suppose, that when, as in the policy on which this suit is brought, insurance is taken on the stock of flour, grain, &c., contained in a steam flouring mill, the Court might well hold, that a mill thus described is a grist mill; that the insured might therefore grind any of the cereals, whatever their name or character: that he might manufacture flour from any grain capable of producing it, and if he thought it expedient, might merely grind up the material, and sell it in the unbolted form as meal. If he was authorized to do this, the description of the article used could not be material, and it was proper therefore that the Judge should inform the Jury, that their finding would determine the question involved in the charge.

The second charge asked by the plaintiffs, and which was with some modification given to the Jury, presented this fact: "that an incident to a trade like that of a miller, is that which does not necessarily belong to it, but which may happen to it, and if the Jury should find the facts stated in the first charge, that the drying of corn by a kiln was deemed to be an improvement in the manufacture of meal, and it was a part of the process, then the insured, D. White & Co., had the right to use such a kiln with fire heat, at the time of the loss."

It was objected in argument to this plea, that it was

hypothetical rather than practical in its assumptions, and there was much philological discussion between the counsel of the parties as to the meaning of the words "happen to," and "incident to." We do not feel the force of any of the criticisms of the counsel, however ingenious or able, as applicable to the point in issue; the plea itself is but the repetition of the principle that had been already laid down in the first charge, and all that can be claimed; its assertion was, that the use of the kiln drying machine, if one state of fact was true, was not inconsistent with the contract of insurance.

What was said by Judge Baldwin in Ewing *vs*. Burnet, 11 *Peters* 54, upon a question of technicality, may well be repeated here : " Punctuation is a most fallible standard by which to interpret a writing; it may be resorted to when all other means fail, but the Court will first take the instrument by its four corners, in order to ascertain its true meaning; if that is apparent on judicially inspecting the whole, the punctuation will not be suffered to change it." And so here we must look into all the special charges asked by both parties, as well as the general charge of the Court to give the whole their legal import. Thus by comparing each with the other, the entire combination will be harmonized and the rights of each party protected.

The second charge asked by the defendants, and which the Judge declined to give, so far as the same was consistent with the view we have taken of the case, was substantially given in the general charge. It was refused as asked, for the Judge was requested to inform the jury, among other things, that if the kiln drying corn meal mill was not a part of a flouring mill, in the ordinary acceptation of the words, as used by underwriters, the verdict should be for the defendants.

We have already said, that the opinions of insurers are not admissible to explain their contracts; they have no right to decide what shall be or what is not embraced in their policies; whatever is the course of business, they are bound to understand. And the fact itself really and substantially existing, gives the character to the subject insured, not the opinions, not the mistaken or misconceived judgments of the underwriters.

The other charges asked by the defendants fully explained the law as favorably for the insurers, as the Court had the power to do; and as they were all given, the defence had the full benefit of the law as there expounded, recognizing the principles we have already referred to, by which the real questions in controversy were distinctly brought to the consideration of the Jury.

The general charge of the Judge, in concluding, to the jury, is but the embodiment of the rules we have held in deciding the demurrers to the second, third, fourth, and fifth pleas. He held, that a flouring mill must be taken to be what it was generally understood to mean, it not having been claimed that it had any technical or local meaning; that the Jury were to judge of the true meaning, and such interpretation put upon the words, as would carry out the intention of the parties, provided that the meaning should be taken most strongly against the insurer. He further stated, that if they should find the parties contemplated the building in question would be used during the risk, for grinding corn and other grains, as well as wheat, then the putting up and using any machinery or apparatus in connection therewith, for facilitating the operations of the business thereby, and not as an independent trade within the hazardous classes of

risks, it would not suspend the operations of the policy. He also charged, that though a building might be occupied in three distinct operations as mill, a manufactory, and for mechanical operations, yet the same individual operation could not be indiscriminately called by either definition; it must be one or the other, it cannot be all three.

To this charge, the defendant also excepted, and claims it to have been erroneous. As corollaries from what we have already laid down as the law of the case, we cannot perceive how the Judge could have stated his view of the contract, and the relative rights of the parties, more clearly. He assumed no fact as proved, but charged only, that if the Jury should be satisfied by the proof, what the subject insured really was, that the law would enforce or withhold a liability upon the insurers. He was asked to refine his view of the law into abstract, we might say arbitrary divisions, when the principles upon which the Jury must have decided, were resolvable into a very simple statement of the case. If he deemed it proper minutely to describe what he believed to be the effect of the conditions attached to the policy, certainly the parties who pressed him with these exceptions, ought not to complain.

We cannot see, that in any of these charges the Judge has erred; and we feel satisfied that in affirming his judgment on the whole case, we but administer substantial justice.

COFFIN & MITCHELL for plaintiffs. WALKER & KEBLER, and TAFT & KEY for defendants.