WILLIAM T. BRAMHALL *vs.* SUN MUTUAL INSURANCE COMPANY

A policy of insurance on a vessel to a port of discharge and until she be moored twenty-four hours in safety does not cover a loss occurring after she has lain three weeks at a place to which she was destined as a place of discharge, where she has discharged a substantial part of her cargo, and at which similar vessels uniformly discharged in whole or in part; although one of her owners, being present at the port, intended to take her into an inner basin in the same port to complete her discharge.

CONTRACT on a policy of insurance on the ship George Washington, for a voyage from Liverpool to the Chincha Islands " and thence to a port of discharge in Spain," and to continue until she should be safely arrived at such port of discharge and be moored twenty-four hours in good safety. The case was submitted to the judgment of the court on agreed facts, of which the material parts were as follows :

" In the prosecution of this voyage, the ship sailed from the Chincha Islands, with a cargo of guano, to Valencia in Spain, to discharge, where she arrived at her anchorage on February 5, 1867. The port of Valencia is an open roadstead, exposed on the easterly side to winds and seas, but with good anchorage and holding ground. All vessels at this port are discharged into lighters; and, until the time hereinafter mentioned, the only place of discharge for vessels arriving there was at the anchorage ground, where the George Washington came to anchor, and lay until the date of her loss. Vessels in the condition of the George Washington, on reaching this anchorage, and before commencing to discharge any part of their cargo, are fully entered at the custom-house, and their papers delivered to the consul of their country. Toward the close of the last century, the Spanish government began some works for the convenience of lighters delivering cargo from vessels at the anchorage ground, and, eventually, for the better protection of shipping. By the year 1854, the basin formed by these works had so far advanced that small coasting vessels of about fifty tons could lie inside the wharf or mole. Since 1854, said works have gradually advanced, until in 1867, when the George Washington was lost, the basin, though not completed, was accessible to vessels drawing not over sixteen feet; and vessels of larger draft, discharging at the anchorage, generally, but not uniformly, came into the basin after sufficiently reducing their draft, for greater convenience of lightering and taking in ballast. But, with this qualification, the place of discharging guano ships remains now, as it has ever since the commencement of that trade been, at the anchorage ground, where they are discharged into lighters furnished by the consignees at the expense of the ship, by stevedores from shore, and without the assistance of the crew. For this reason vessels, after anchoring at the place of discharge, sometimes discharge a part of their crew, retaining only enough to protect the ship. The time usually occupied in discharging a ship of the George Washington's tonnage varies from four to six weeks, according to the weather and the pleasure of the consignees.

" On the arrival of the George Washington at Valencia, she drew about twenty-two feet of water, and came to anchor, under the direction of the port authorities, at the usual place of anchorage and discharge for vessels of her size and draft, and was duly entered at the custom-house. The master lodged his ship's papers with the United States consul, as required by law; notified the consignees of his readiness to discharge; discharged his ship-carpenter and part of his crew, and, as soon as lighters were furnished by the consignees, which was about three days after the ship reached her anchorage, she commenced discharging, and lay thereafter at anchor in good safety during the remainder of the month of February, and until about March 3, 1867, several other guano vessels lying meanwhile in the immediate vicinity, discharging.

" Within a fortnight after the discharging commenced, the master of the George Washington left Valencia and returned home, arriving in Boston the same day the ship was lost at Valencia. After the master's departure, the mate, and such of the crew as had not been discharged, remained in charge of the vessel ; one of her owners, John Taylor, being at the time on shore at Valencia, whither he had gone to look after the general business of the ship, to collect her freight, and to seek future employment for her. The plaintiff can prove, if admissible and material, that Taylor intended to take the vessel into the inner basin to complete her discharging.

" On March 3, 1867, while the George Washington lay at her anchorage, in charge of the mate, with no master, and with only part of her crew on board, one of the vessels lying near her went adrift in a gale, and dragged toward the George Washington, and the mate, to avoid a collision, which he deemed imminent, slipped her chains, and the vessel was driven on to the beach and there went to pieces. When the vessel went on shore, she had on board the mate, the cook, a carpenter shipped at Valencia for the next voyage, and eleven seamen, out of the ordinary crew of eighteen men. Prior to her loss, the George Washington had discharged and delivered in safety to the consignees 766 tons of guano out of the 2000 tons, or thereabouts

which constituted her cargo; and freight, amounting to upwards of $18,000, on the cargo so delivered, was paid to Taylor by the consignees of the cargo."

*F. C. Loring*, for the plaintiff.

*R. H. Dana, Jr., & J. D. Bryant*, for the defendants.

GRAY, J.  A vessel arrives at a port of discharge when she arrives at any place at which it is usual to discharge cargo, and to which she is destined for the purpose of discharging cargo. Upon her arrival at that place, a policy insuring her until arrival at a port of discharge terminates, and cannot be extended or revived, after she has discharged part of her cargo there, by her removal to another port, or to another place in the same port, either for the purpose of discharging the rest of her cargo, or for any other purpose.  This rule has long been established, so far as to exclude the continuance of the risk to a second port under a policy insuring a vessel to a single port of discharge. *Leigh* v. *Mather*, 1 Esp. 411.  *Coolidge* v. *Gray*, 8 Mass. 531. *Dodge* v. *Essex Insurance Co.* 12 Gray, 65.  *Fay* v. *Alliance Insurance Co.* 16 Gray, 455.  1 Phil. Ins. §§ 955, 962, 993.  The removal, after discharging part of her cargo at a place at which she has anchored for the purpose, to another place in the same port, is within the same principle.

The case of *Whitwell* v. *Harrison*, 2 Exch. 127, is decisive of this question.  In that case, the policy was upon a ship from Liverpool to Quebec, and thence back " to her discharging port in the United Kingdom, and until she had moored at anchor twenty-four hours in safety."  The ship was chartered to take on board a cargo of lumber at Quebec and proceed therewith to Wallasey Pool in the River Mersey, or as near thereto as she could safely get, and there discharge her cargo.  She came into the Mersey, and being unable, by reason of her too great draft of water, to get into Wallasey Pool, anchored abreast of it, and proceeded for several days to discharge her cargo and raft it into the port, and, while doing so, fell over and sustained damage. It was proved that the captain always intended to take the ship into Wallasey Pool with as much of the cargo on board as she could safely carry there.  Upon these facts, Baron Rolfe (after-

wards Lord Cranworth) ruled that the underwriter was not liable, and directed a verdict for the defendant. In a judgment delivered by Baron Alderson, the court of exchequer (of which, besides these two able judges, Barons Parke and Platt were then members) refused a new trial, upon the ground that the place of anchorage was the intended place for the discharge of the cargo, and that the vessel had therefore clearly arrived at her port of discharge, and had been moored there twenty-four hours in safety before the accident occurred.

Anchoring for the purpose of discharging cargo at a place to which the ship is destined for that purpose, and at which ships usually discharge cargo, is equally an arrival at a port of discharge, although the place is not within any harbor. It is not necessary to refer to cases of time policies, for it is clear that such a place is a port, within the meaning of the description of the voyage insured in a voyage policy. *De Longuemere* v. *New York Insurance Co.* 10 Johns. 120. *Sea Insurance Co.* v. *Gavin,* 4 Bligh, N. S. 578; *S. C.* 2 Dow & Cl. 129. *Lindsay* v. *Janson,* 4 H. & N. 699. *Harrower* v. *Hutchinson,* Law Rep. 4 Q. B. 523, and Law Rep. 5 Q. B. 584.

We find nothing inconsistent with these views in the decisions cited by the learned counsel for the plaintiffs. In *Dickey* v. *United Insurance Co.* 11 Johns. 358, *Zacharie* v. *Orleans Insurance Co.* 17 Martin, 637, and *Samuel* v. *Royal Exchange Assurance Co.* 8 B. & C. 119, the vessel had been obliged by order of the port authorities, or stress of weather, to anchor without reaching any place at which she intended to remain or to discharge any part of her cargo.

In *Brereton* v. *Chapman,* 7 Bing. 559, the only point decided was, that the lay days allowed by a charter party for the ship's discharge were not to be reckoned from her arrival at the entrance of the port, although she there removed a portion of her cargo into lighters because she drew too much water to proceed with her entire cargo; but it was admitted on all hands, and declared by the court, that they would run from the time of her arrival at the usual place of discharge That case appears to us, as it did to the court of exchequer in *Whitwell* v. *Harrison,* not

at all to affect this question, and for the reason stated by Baron Alderson : " There the vessel was still in progress to the ultimate place for the discharge of her whole cargo, and all that was done was to put on board lighters a portion of the cargo, in order that the vessel might be enabled thereby without delay to proceed with them to the usual place of discharge." 2 Exch. 135. It may be added that it appears by the fuller report of *Brereton* **v.** *Chapman,* in 5 Moore & Payne, 526, that, upon arrival within the entrance of the harbor, the master reported the vessel, and told the consignee that she was aground and in an unsafe situation, and that it was necessary that a lighter should be sent down in order that by taking out a part of the cargo she might get up to the quay.

In *Taber* v. *Nye,* 12 Pick. 105, which was upon a seaman's contract for a whaling voyage "from New Bedford and back to New Bedford," it was only decided that the voyage had not terminated by the grounding of the vessel, without casting anchor or furling sails, on a bank outside of the harbor, though within the legal limits of the town and port of New Bedford, and remaining there a few hours, after which she floated and was brought into the harbor. Mr. Justice Putnam, in delivering the opinion of the court, said : " It is perfectly clear that by the returning to New Bedford the parties meant to her destined place of mooring there, and not merely to the waters and territory within the limits of the town and port of New Bedford." " But this ship took the ground while she was proceeding to her place of mooring."

The case of *Meigs* v. *Mutual Marine Insurance Co.* 2 Cush. 439, was of a policy upon a ship for a whaling voyage, and back to Mattapoisett, and to continue until she had arrived and been moored at anchor twenty-four hours in safety. The question whether the ship had arrived was submitted to the judgment of the court upon the testimony of the pilot who brought her into the harbor, which the court held must therefore be taken as true, and the essential part of which, and the question arising thereon, were thus summed up by Mr. Justice Fletcher in delivering judgment : " One of the facts most expressly and distinctly

stated by him is, that the destination of the ship was to **Long Wharf**; that she came to anchor, not to unlade, but to lighten, in order to enable her to get to her place of destination; and that she was making her way towards the point to which she was destined, and before reaching it was destroyed. The simple question therefore is, whether the ship, being destined to the wharf as the place of unlading, but being obliged to anchor after coming within the harbor for the purpose of lightening, to enable her to go up to the wharf, there not being sufficient water for her to reach the wharf with the cargo all in, is to be considered as having arrived, within the meaning of the policy, upon reaching the place of anchoring for the purpose of lightening." It is to the facts thus found, and the question of law thus stated, that the judgment against the underwriters in that case is to be applied. It was indeed said in the opinion : " While she is properly pursuing her course to the place of her ultimate destination and of complete and final unlading, and until she reaches that place and has been moored there in safety twenty-four hours, she is insured and protected by the policy." As applied to the case in judgment, this was a sound and accurate statement of the law. But it is not to be inferred from this, in opposition to all the other authorities, that in a different case, not then before the court, of a vessel destined to a particular place short of the wharf, for the purpose of discharging part and perhaps the whole of her cargo, and which did discharge part at that place, and remain there twenty-four hours in safety, the vessel would afterwards continue to be covered by the policy.

The effect of the clause in the policy, by which the risk is to continue until the vessel shall have safely arrived and be moored twenty-four hours in good safety, is settled, in accordance with a judgment of this court delivered by Chief Justice Parsons sixty years ago, to be simply to continue the risk against the perils insured against for twenty-four hours after the arrival and mooring of the vessel. If at the expiration of that time she has suffered no loss from those perils, the policy is at an end. *Bill* v. *Mason*, 6 Mass. 313. *Lidgatt* v. *Secretan* Law Rep. 5 C. P. 190. 1 Phil. Ins. § 968.

Applying the principles of law thus established to the facts agreed by the parties, it is clear that the George Washington had safely arrived at her port of discharge in Spain, and been there moored twenty-four hours in good safety, before the loss sued for. She proceeded to Valencia to discharge, and anchored at that port in an open roadstead, exposed indeed on one side to the winds and seas, but with good anchorage and holding ground. She was fully entered at the custom-house, and the master lodged her papers with the consul of the United States as required by law, notified the consignees of his readiness to discharge, dismissed part of her crew, retaining only enough to protect the ship, and himself left the ship and returned to the United States before the loss. The ship drew too much water to come into the basin ; and the place of her anchorage is found to have been the place at which ships of her draft are usually discharged, by means of lighters furnished by the consignees at the expense of the ship, by stevedores from the shore, and without the assistance of the crew ; although such vessels, " discharging at the anchorage, generally, but not uniformly, come into the basin after sufficiently reducing their draft, for greater convenience of lightering and taking in ballast." As soon as lighters were furnished by the consignees, three days after she reached her anchorage, the ship began to discharge, lay at anchor there for more than three weeks, and discharged one third of her cargo.

The fact, if proved, that one of her owners, being then at Valencia, " whither he had gone to look after the general business of the ship, to collect her freight, and to seek future employment for her," intended to take her into the inner basin to complete her discharge, could not be allowed any greater weight as against the controlling fact that she had, arrived and been moored twenty-four hours in good safety at the place to which she was originally destined as a place of discharge, at which she did discharge a substantial part of her cargo, and at which similar vessels uniformly discharge in wnole or in part, than was allowed by the court of exchequer to corresponding evidence in *Whitwell* v. *Harrison*, above cited.

Our judgment cannot be affected by the decision of the tribunal of commerce of the city of Valencia in a case of general average between the parties interested in another ship injured in the same place at the same time, (a copy of which was handed to us at the argument,) because we have been furnished with no evidence of the terms of the contracts between those parties, the foreign law by which the case was governed, or the nature or grade of the tribunal by which the decision was made.

*Judgment for the defendants.*