### SIMPSON v. PACIFIC MUT. INS. CO.

[Holmes, 136.] [1]

Circuit Court, D. Massachusetts.   March, 1872.

#### MARINE INSURANCE—TIME POLICY—ANCHORING.

A policy of insurance on a vessel for a voyage to a certain port and twenty-four hours after anchoring in safety, is not terminated by her arrival, and lying at anchor in safety more than twenty-four hours, at the anchorage ground outside the harbor of the port, and there, according to the custom of vessels of her draught bound for the port, discharging part of her cargo by lighters, in order to enable her to pass over a bar at the entrance to the harbor.

Action at law upon a policy of insurance [by William H. Simpson against the Pacific Mutual Insurance Company]. The case was submitted to the court on an agreed statement of facts, the material parts of which are stated in the opinion.

F. C. Loring, for plaintiff.

Oliver Prescott and George Marston, for defendant.

SHEPLEY, Circuit Judge. This suit is against the defendant as underwriter on a policy of insurance upon the ship Live Oak, for a voyage from Cardiff to New Zealand, Callao, Chincha Islands, and thence to Valencia, Spain. The policy was to terminate on the arrival of the ship at Valencia, in the kingdom of Spain, and being at anchor twenty-four hours in safety. Proofs of loss were exhibited to the defendant April 25, 1868. Payment is refused, on the ground that the risk had terminated before the ship was lost.

The ship arrived on the seventh day of December, 1867, at the anchorage ground, which is open and exposed outside of the artificial harbor of Valencia. At this anchorage ground vessels of large draught anchor and lie, until they are lightened sufficiently to pass the bar at the entrance of an outer artificial basin, formed by stone walls projected into the sea, where they are further lightened, until they can pass the bar at the entrance of the inner artificial basin or harbor, where the discharge of the cargo is completed by lighters. Vessels are never discharged completely at the anchorage ground.

On the eighth day of December lighters came and began to discharge, and continued to do so on the ninth, by which the vessel was lightened about one foot. On the morning of the tenth there were signs of a heavy gale, and the master received orders from the captain of the port to send down the top-gallant-yards and masts, and to have axes in readiness to cut away the masts.

Afterwards the master started for the shore, and was informed that the captain of the port had ordered the pilots to bring the ship into the outer harbor, and that a steam-tug was

[1] [Reported by Hon. John McLean, Circuit Justice.]

[1] [Reported by Jabez S. Holmes, Esq., and here reprinted by permission.]

coaling for the purpose. The master protested to the pilots and to the captain of the port, whose authority in such cases is supreme, against this being attempted, considering that, as the sea was very high, the danger of being driven ashore, if the ship remained at anchor, was much less than that of taking the bottom in crossing the bar. But the officers of the port insisted. The tug went to the ship, made fast, and attempted to tow her in. Near the end of the breakwater three heavy seas came in together: the first broke between the ship and the tug, throwing the latter ahead with such force as to cause the bitts to which the hawsers were fastened to give way. The ship immediately struck the bottom, her keel came up, in twenty minutes she had seventeen feet of water in her hold, soon filled, and began to break up, and was totally lost. None of the crew had been discharged.

The question presented for adjudication is, whether, on the facts which appear in this case, the ship is to be considered as having arrived at Valencia, and been at anchor twenty-four hours in safety before she was wrecked. If she had, the risk had terminated; if she had not, the defendant is liable.

A vessel arrives at a port of discharge when she comes, or is brought, to the place where it is intended to discharge her, and where is the usual and customary place of discharge. When a vessel is insured to one or two ports, and sails for one, the risk terminates on her arrival there.

If a vessel is insured to a particular port of discharge, and is destined to discharge cargo successively at two different wharves, docks, or places, within that port, each being a distinct place for the delivery of cargo, the risk ends when she has been moored twenty-four hours in safety at the first place. But if she is destined to one or more places for the delivery of cargo, and delivery or discharge of a portion of her cargo is necessary, not by reason of her having reached any destined place of delivery, but as a necessary and usual nautical measure, to enable her to reach such usual and destined place of delivery, she cannot properly be considered as having arrived at the usual and customary place of discharge, when she is at anchor for the purpose only of using such means as will better enable her to reach it.

If she cannot get to the destined and usual place of discharge in the port, because she is too deep and must be lightened to get there, and, to aid in prosecuting the voyage, cargo is thrown overboard or put into lighters, such discharge does not make that the place of arrival: it is only a stopping-place in the voyage.

When the vessel is insured to a particular port of discharge, arrival within the limits of the harbor does not terminate the risk, if the place is not one where vessels are discharged and voyages completed. The policy covers the vessel through the port navigation as well as on the open sea, until she reaches the destined place.

In Meigs v. Mutual M. Ins. Co., 2 Cush. 453, the court say, "Reaching the harbor, therefore, cannot be arriving, within the meaning of the policy; and if it do not mean that, it must mean that particular place or point in the harbor which is the ultimate destination of the ship. Until that point is reached, the voyage is not ended, and the ship has not arrived; though she may be obstructed and delayed in her progress through the harbor, and for want of water, or by adverse winds or other causes, be obliged to come to anchor, and remain at anchor twenty-four hours, and to take out some portion of her cargo. While she is properly pursuing her course to the place of her ultimate destination and of completed and final unlading, and until she reaches that place, and has been moored there in safety twenty-four hours, she is insured and protected by the policy."

In Brown v. Tierney, 1 Taunt. 517, a vessel bound for Pillaw had arrived at Pillaw Roads, where ships bound for Pillaw which draw much water usually bring to, and unload some part of their cargo to lighten them sufficiently for passing the bar. Although the ship had arrived at the place where she was to begin unloading, and had reached her port of discharge, yet inasmuch as it was not proved to be ever the practice wholly to discharge a ship in Pillaw Roads, but only to lighten her sufficiently to enable her to enter the harbor, it was decided that the ship was to be considered "as much at open sea as ever she had been."

In Samuel v. Royal Exch. Assur. Co., 8 Barn. & C. 119, a vessel insured from Sierra Leone to London, and upon which the insurance was to endure until she had been moored in good safety twenty-four hours, arrived on the 18th of February, and the captain, having orders to take her into the King's Dock at Deptford, moored her near the dock gates. On account of ice in the river, the ship could not enter the dock until the 27th; and then, in warping her towards the dock, a rope broke, she grounded, and was totally lost. Lord Tenterden held, that, the place where the vessel was moored not being the place of her ultimate destination, the policy did not expire when she had been there in safety twenty-four hours.

In the case of Brereton v. Chapman, 7 Bing. 559, it was held, that the lay-days allowed by a charter-party, for a ship's discharge, are to be reckoned from the time of her arrival at the usual place of discharge, though she should, for the purposes of navigation, discharge some of her cargo at the entrance of the port, before arriving at the usual place of discharge.

In the case of Whitwell v. Harrison, 2 Exch. 127, the vessel was chartered to take on board a cargo of timber at Quebec, and to proceed therewith to Wallasey Pool, in the river Mersey, or as near thereto as she could safely get, and there discharge her cargo. The vessel arrived as near to Wallasey Pool as she

could safely get, and did actually begin to discharge her cargo accordingly, discharging her crew altogether, and leaving none of them on board for the purpose of further navigation. It appeared in evidence that the captain always intended ultimately to carry the vessel into Wallasey Pool, with as much of the cargo on board as she could carry over the shallow part intervening between his original anchorage and the Pool. But it was also clearly established that the discharge of the cargo was going on in due course, and that, if the water were not sufficient, and no accident had occurred, the whole cargo would have been discharged in the place where the vessel was moored. The court decided, that, as the ship was bound either to Wallasey Pool, or as near thereto as she could safely get, that that was the intended place for the discharge of her cargo, and that therefore the vessel had clearly arrived at the port of her discharge. Alderson, B., in delivering the judgment of the court, distinguishes the case of Whitwell v. Harrison by saying, "The case of Brereton v. Chapman, 7 Bing. 559, does not appear to us at all to affect this question. There the vessel was still in progress to the ultimate place of the discharge of her whole cargo; and all that was done was to put on board lighters a portion of the cargo, in order that the vessel might be enabled thereby, without delay, to proceed with them to the usual place of discharge. There the whole crew remained on board, and the vessel was in all respects really continuing her voyage."

In the case of Whitwell v. Harrison, the case turned upon the facts that the vessel had arrived at one of the places of discharge specified in the charter-party, as the intended places for the discharge of the cargo, and that the discharge of the cargo was going on in due course, and not merely for the purpose of further navigation. Whitwell v. Harrison, therefore, differs in no degree from the earlier cases, which decide that the place at which a vessel unloads the whole or part of her cargo for the purpose of discharge will be the place of the termination of a risk to a port of discharge. But neither Whitwell v. Harrison, nor any other case which we have been able to find, decides that a place at which a vessel unloads part of her cargo, in order to lighten the vessel and enable her to proceed with the residue, would be the place of the termination of the risk to a port of discharge.

The recent case of Bramhall v. Sun Ins. Co., 104 Mass. 510, was decided upon the following state of facts, as stated in the opinion of Judge Gray (page 517): "It is clear that the George Washington had safely arrived at her port of discharge in Spain, and been there moored twenty-four hours in good safety before the loss sued for. She proceeded to Valencia to discharge, and anchored at that port in an open roadstead, exposed indeed on one side to the winds and seas, but with good anchorage and holding ground. She was fully entered at the custom-house; and the master lodged her papers with the consul of the United States, as required by law, notified the consignees of his readiness to discharge, dismissed part of her crew, retaining only enough to protect the ship, and himself left the ship and returned to the United States before the loss. The ship drew too much water to come into the basin; and the place of her anchorage is found to have been the place at which ships of her draught are usually discharged, by means of lighters furnished by the consignees at the expense of the ship, by stevedores from the shore, and without the assistance of the crew; although such vessels, 'discharging at the anchorage, generally, but not uniformly, come into the basin after sufficiently reducing their draught, for greater convenience of lightering and taking in ballast.' As soon as lighters were furnished by the consignees, three days after she reached her anchorage, the ship began to discharge, lay at anchor there for more than three weeks, and discharged one-third of her cargo."

The facts in the case before the court are clearly distinguishable from the facts agreed in Bramhall v. Sun Ins. Co. In that case, the place of the vessel's anchorage was found to have been the place at which ships of her draught are usually discharged. In this case, it is clearly proved that vessels are never completely discharged at the anchorage ground, but only lightened sufficiently to enable them to reach the inner harbor. In several other particulars, more or less important, the cases differ.

But the substantial difference in the two cases, as agreed by the parties and established by the proofs in the case, consists in this: that in Bramhall v. Sun Ins. Co., it was agreed by the parties, and found by the court, that the anchorage ground where the George Washington unladed a portion of her cargo; where the master dismissed part of the crew and himself left the ship to return home to the United States; where the ship lay at anchor for more than three weeks, and discharged a third of her cargo before the loss,—was a usual and destined place of discharge; while, in the case before the court, it most clearly appears from the facts agreed and proved in the case, that the lightering of the Live Oak at the anchorage ground was only to lighten her in order to enable her to get to her place of destination.

The question presented in this case, therefore, is the precise question stated by the court in the case of Meigs v. Mutual M. Ins. Co., 2 Cush. 452, 453, where they say, "The simple question, therefore, is, whether the ship, being destined to the wharf as the place of unlading, but being obliged to anchor after coming within the harbor, for the purpose of lightering, to enable her to get up to the wharf, there not being sufficient water for her to reach the wharf with the cargo all in, is to be considered as having arrived within the meaning of the policy, upon reaching the place of anchoring for the purpose of lightering."

Upon the facts as agreed in the case of Bramhall v. Sun Ins. Co., we would not undertake to decide, as contended for by the plaintiff's counsel, that the decision in that case is not in harmony with the authorities before referred to.

But, upon the facts as agreed and proved in this case, it seems to the court clear, both upon principle and authority, that the Live Oak cannot properly be considered as having arrived and been moored in good safety for twenty-four hours before the loss. Judgment for plaintiff.