HENRY RODEE and Another, Respondents, *v.* DETROIT FIRE AND
MARINE INSURANCE COMPANY, Appellant.

*Insurance of the cargo of a vessel — when it expires — early notice of loss — evidence
as to value.*

The cargo of a vessel was insured until such time as it should arrive and be.
safely landed at its point of destination, not to exceed forty-eight hours from
the time of its arrival, by an insurance policy which contained a condition
requiring early notice of a loss    During the voyage a portion of the cargo
was damaged, and upon the arrival of the vessel at a point near its destination,
which was the dock or elevator of the assured, it was found that it could not
reach such destination until it had been lightered.   After being lightered the
vessel reached the dock on Saturday, and notice of loss was given to the resident
agent of the defendant on the following Monday or Tuesday.

*Held,* that the voyage was not ended within the terms of the policy until the vessel
was actually landed at the plaintiffs' dock, where the cargo could be removed;

That what is early notice of a loss is to a certain extent to be determined by the
circumstances of each particular case, and under the circumstances, the notice
given in the case in question, though not an immediate, was an early notice.

Where a witness has testified as to the value of grain, and such evidence was
admitted without objection, and it afterwards appeared that the witness testi-
fied as to such value not only from his own experience but also from daily
market quotations he had received, it is not error to deny a motion to strike
out his testimony in regard to the value of such grain.

APPEAL by the defendant, Detroit Fire and Marine Insurance
Company, from a judgment of the Supreme Court in favor of the
plaintiff, entered in the office of the clerk of the county of St.
Lawrence on the 7th day of February, 1893, upon the verdict of a
jury rendered at the St. Lawrence Circuit, and also from an order
entered in said clerk's office on the 23d day of February, 1893,
denying the defendant's motion for a new trial made upon the
minutes.

*George Clinton,* for the appellant.

*Louis Hasbrouck* and *Alric R. Herriman,* for the respondents.

HERRICK, J. :

By a policy of insurance dated August 20, 1891, the defendant
insured a cargo of grain belonging to the plaintiffs, on board the
schooner *Hartford,* to be transported from Detroit to Ogdensburg,

the policy reading "in board cargo of the Schr. *Hartford*, at and from Detroit to Ogdensburg."

It was provided in the policy that the property insured should be insured from "beginning the adventure upon the said property from and immediately following the loading thereof at the port and place named in the indorsement, and so shall continue and endure until the same shall arrive and be safely landed at the port of destination, not to exceed forty-eight hours from time of arrival." It was further provided in said policy of insurance that "in case of loss or damage to property hereby insured, it is agreed that this company, their agent or representative, shall have early notice of the same."

On its way from Detroit to Ogdensburg the schooner encountered a storm, and took in some water, whereby a portion of the grain became wet; the testimony of the captain, which seems to have been taken as conclusive, was that the water came in around the center-board box; the strain of the center board on the center-board box which inclosed it worked the box in such a way as to let in the water.

The vessel reached a point at or near Ogdensburg on the morning of the third of September, but could not reach the plaintiffs' dock or elevator, because of the depth of the vessel in the water, until a portion of the grain had been taken out of the vessel — "lightered out in bags," that is, "we put the wheat into bags and put it into a lighter till we got light enough draft so we could go up the river." After taking out a portion of the wheat, and so lightening the vessel, it proceeded up the river to the plaintiffs' elevator, arriving there on Saturday, the fifth.

The plaintiffs proceeded to unload the vessel by means of the elevator; it was discovered that the wheat was damaged; there were some lumps or cakes of it around the center-board box; the lumps or cakes of damaged wheat were attempted to be kept separate from the rest, but in taking them out some of them crumbled away and got mixed with the other wheat. In proceeding further with the unloading it was discovered that a portion of the wheat on the bottom of the vessel was wet; some of the wheat in the cargo was so wet that it sprouted.

The plaintiffs commenced grinding the wheat as rapidly as possible, upon the theory subsequently explained by the plaintiff Rodee upon

the trial, that the wheat would become worse if not immediately disposed of, and a considerable portion of the wheat was ground up.

Upon the trial the court charged the jury that no allowance should be given by them for any loss or damage for that portion of the wheat so ground into flour.

On Monday or Tuesday, it is uncertain which — in one portion of the evidence he says on Monday and in another portion on Tuesday morning — the plaintiff Rodee gave notice of the loss to the defendant's agent at Ogdensburg, who notified the home office of the company, who sent an adjuster to examine into the loss, if any.

The principal questions litigated were whether the plaintiffs had given timely notice of the loss and whether they had proved by legal evidence the loss or damage sustained by them. It was practically conceded on both sides that the loss or damage should be measured by the difference between the value of the grain at Ogdensburg upon its arrival in a sound and undamaged condition, and its actual value in its damaged condition, and it is claimed by the defendant that an essential element was to prove what its market value would have been if sound and undamaged, and his claim is that the plaintiffs failed to give any legal evidence of such market value.

The plaintiff Rodee testifies in his direct examination: "In my opinion $1.12 per bushel would be the cash market value of the 23,001 bushels of wheat composing that cargo had it arrived at Ogdensburg sound." No objection to this testimony was made by the defendant.

In his cross-examination this plaintiff testified: "The cash market price was $1.12 for No. 2 red — this was Michigan wheat. When the vessel arrived that was the cash value in Ogdensburg. We had the market quotations every day. That is what a cargo of No. 2 red wheat would have cost to have bought it and delivered it at Ogdensburg that day when the wheat arrived there, adding freight and insurance to it; I take the cost of the cargo and add freight and insurance. The cost of this cargo was $1.06 and nearly one-half cents at Detroit; then the freight was five cents and the insurance, I think, was about half a cent a bushel; then there was exchange. I added all that together and called it the cash market value at Ogdensburg."

At the close of the plaintiffs' evidence the defendant moved to

strike out the evidence in regard to the value of the sound wheat upon the ground " that it appears from the testimony of the witness Rodee, that the valuation which he gives, and which is the only evidence as to value, he arrives at by taking the cost of the wheat, adding freight, insurance and exchange."

The court in declining to grant the· motion said : " The courts have held that the cost of an article is some evidence of its value. And Mr. Rodee does not entirely limit his estimate to the method you speak of, as I understand his testimony. He goes upon his own experience. He says they received daily market valuations, I suppose from some center, and that his own judgment as a purchaser of wheat for many years coincides with the cost of wheat at Ogdensburg."

As to the first question suggested, that the plaintiff did not comply with the condition of the policy requiring early notice of the loss, it seems to me that the trial court made no error.

The property was insured until the vessel should arrive " and be safely landed at the port of destination, not to exceed forty-eight hours from time of arrival."

It appears that the vessel could not land at the plaintiff's dock or elevator until she had been lightered, that is, a portion of the cargo removed, and the place where she commenced the lightering was not her point of final destination, and the voyage was not ended within the terms of the policy until the vessel was actually landed at the plaintiff's dock, where the cargo could be removed. (*Meigs* v. *The Mutual Marine Ins. Co.*, 56 Mass. [2 Cush.] 439 ; *Bramhall* v. *The Sun Mutual Ins. Co.*, 104 id. 510.)

The vessel reached plaintiff's dock or elevator on Saturday, and notice was given to the resident agent of the defendant on the following Monday or Tuesday. What is early notice of the loss is to a certain extent to be determined by the circumstances of each particular case. (*Bennett* v. *Lycoming Co.*, 67 N. Y. 274–277.)

Upon first beginning to remove the wheat from the vessel the full extent of the damage could not be ascertained ; there were lumps or cakes of the dampened wheat around the center-board box ; by the terms of the policy unless the loss or damage reached five per cent it was not recoverable, and it may very well be that the plaintiff would be justified in not giving notice until it appeared that the

loss was reaching that per cent which would entitle him to a recovery.

The grain was unloaded on Saturday, when the full extent of the loss was apparent. The next day was Sunday, not a business day, and notice was given the following Monday or Tuesday, and it seems to me that that is a fair compliance with the terms of the policy ; it is not immediate notice, but it is " early notice.". As to the proof of damage which the defendant asked to be stricken out, I think that the trial court committed no error in that respect : *First*, it was admitted without objection ; *second*, it appears, as suggested by the trial court, that the witness not only testified from his own experience, but that they received daily market quotations. As to which the witness laid the most stress upon, the court which heard him give his testimony, and his manner of giving it, can judge much better than the appellate court as to whether he relied entirely upon his method of computing the value, or whether upon the market quotations, or upon both. As the testimony appears in the case, the witness seems to have been qualified to form his judgment as to the value of the grain from the market quotations, and also upon his own judgment and computation, as explained by him and heretofore set forth.

I do not think it necessary to discuss any of the other questions raised in the case or the facts relating thereto.

The judgment should be affirmed, with costs.

MAYHAM, P. J., and PUTNAM, J., concurred.

Judgment affirmed, with costs.